IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-30883

_____

KORDICE M. DOUGLAS,

                        Plaintiff - Appellee-Cross-Appellant,

                versus

DYNMcDERMOTT PETROLEUM OPERATIONS
COMPANY; JOHN POINDEXTER,

                        Defendants - Appellants-Cross-Appellees.
_____

        Appeals from the United States District Court for the
                    Eastern District of Louisiana
_____
                        June 18, 1998
Before JOLLY, DAVIS, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

        This case presents the question whether an in-house counsel's disclosing informally to third parties information relating to interoffice complaints of discrimination against her constitutes a breach of her professional ethical duties of confidentiality and loyalty, and if so, whether such conduct is protected under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.  We hold that, although an attorney's unethical disclosures may constitute opposition to practices made unlawful by Title VII, such conduct is nevertheless unprotected under Title VII

(and § 1981) as a matter of law.  Accordingly, we reverse the verdict and judgment of the district court.

I

DynMcDermott Petroleum Operations ("DynMcDermott") is a private corporation that employs over 900 individuals and manages the Department of Energy's (the "DOE") Strategic Petroleum Reserve facilities. Kordice Douglas is a black female attorney. She was hired by DynMcDermott to review procurement contracts, oversee ongoing litigation, and assist DynMcDermott's human resources department with legal issues. As in-house counsel, she was privy to all of her employer's legal files and confidential information concerning employee disputes.

Before signing on with DynMcDermott, Douglas worked as in-house counsel for Boeing Petroleum Services, Inc. ("BPS"), the company that previously had managed the petroleum reserve facilities. DynMcDermott successfully bid on the management contract for the facilities and took over its administration in 1993. More than 90% of BPS employees made the transition to employment with DynMcDermott, including Douglas who initially began work with DynMcDermott on April 1, 1993, without a temporal gap between employment. Douglas's job responsibilities and salary remained the same except that she also was assigned to serve as the primary legal contact for the human resources department of DynMcDermott.

3

The relationship between DynMcDermott and the DOE was purely contractual and at arm's length. Under the contract, DynMcDermott simply agreed to perform certain managerial and administrative services for the DOE. The contract required that DynMcDermott operate free from discriminatory practices, but DynMcDermott neither implicitly nor explicitly waived any of its rights of confidentiality or privilege with respect to its in-house counsel. In connection with the antidiscrimination provision, DOE officials met with DynMcDermott employees at various times to assure that DynMcDermott was complying with this aspect of the contract ("EEO audits"). Just such a meeting occurred on June 6, 1994, between John Poindexter--DynMcDermott's general counsel and Douglas's supervisor--and three DOE employees.

Poindexter requested that Douglas attend the June 6 meeting because she was familiar with the DOE's particular areas of inquiry regarding DynMcDermott's employment practices. DynMcDermott was unhappy with Douglas's professional conduct at this meeting. Specifically, the DOE auditors asked if Douglas were aware of any equal pay claims of women at the different sites. Douglas indicated that she was not, but further responded, "Maybe I'll get my money now."[1] When informed by the DOE of a large number of

---

[1]This remark arose in the context of demonstrating Douglas's alleged dissatisfaction with her salary. Douglas submits that she previously had discussed her dissatisfaction with her salary with

4

complaints that it had received from DynMcDermott employees, Douglas also voluntarily offered her opinion that it was a dangerous situation--"a class action waiting to happen." She further informed the auditors of one particular employee's (Becky Roussell's) discrimination complaint that had not been resolved to the employee's satisfaction. The day after the meeting, Douglas disclosed to the DOE attorney, who had initiated the audit, additional information--allegedly confidential--regarding her investigation into Ms. Roussell's claim.[2]

Two weeks after the meeting with the DOE auditors, Poindexter met with Douglas to discuss her written performance evaluation. One of the comments in the evaluation indicated that Douglas had failed to exercise good judgment during the June 6 meeting with the DOE officials. Douglas objected to several critical comments in her evaluation, including one concerning her alleged lack of discretion during the DOE meeting. Poindexter upwardly adjusted several specific ratings, but maintained her overall evaluation of "fully satisfactory."

---

Poindexter, that he had failed to take any action on her behalf, and that her remark at the audit was a protest of her allegedly unequal pay.

[2]The day after the audit, Douglas told the DOE attorney that she had prepared a report of the "Becky incident," but that she thought DynMcDermott's Human Resources Department manager had changed the report.

5

Douglas was still dissatisfied with her performance evaluation. Thus, a few days later, she composed a five-page response (hereinafter "Response Letter" or "Response" or "Letter") to her evaluation in which she complained that she had been subjected to racial and sexual discrimination. She also further discussed events surrounding Becky Roussell's complaint and a separate business matter that she had handled for DynMcDermott involving BellSouth Mobility. Douglas presented her Response Letter not only to Poindexter, but also to three other DynMcDermott employees, and to Richard O'Neill, a whistle-blower officer with the DOE. Upon inquiry from O'Neill, however, Douglas confirmed that the DOE was *not* to treat the Response as a whistle-blower complaint.

When DynMcDermott learned that Douglas had furnished her Response Letter to an individual outside the confines of the company, it convened a "termination board" to discuss the consequences of Douglas's actions. The board members included the president, the director of human resources, the deputy project manager, and Poindexter, the company's general counsel. After meeting several times and conducting research into Douglas's attorney-client duties of loyalty and confidentiality and the company's duties under the antidiscrimination statutes, the board

6

unanimously agreed to terminate Douglas's employment. DynMcDermott informed Douglas of the decision on July 7, 1994.

After her termination, Douglas forwarded her Response Letter to several other individuals outside DynMcDermott, including the local head of the NAACP, Congressman William Jefferson, and Hazel O'Leary, the Secretary of the DOE. In addition to the Letter, Douglas also furnished O'Leary with a package of DynMcDermott's private documents gathered from the company's legal files before she was discharged. She later filed a claim of discrimination with the EEOC alleging as the sole basis of liability that DynMcDermott retaliated against her when she "opposed practices made unlawful under Title VII." The EEOC issued her a right-to-sue letter and she timely filed an action in federal district court.

## II

Douglas filed suit in the Eastern District of Louisiana against John Poindexter, DynMcDermott, and other corporations connected to DynMcDermott alleging (1) retaliation under Title VII, (2) retaliation under 42 U.S.C. § 1981, (3) conspiracy under 42 U.S.C. § 1985, (4) race discrimination under § 1981 regarding her right to enter into future employment contracts as an attorney, (5) race and sex discrimination under Title VII, and (6) state law claims for defamation, intentional infliction of emotional distress, and gender discrimination. She sought back pay,

7

compensatory and punitive damages, injunctive relief, and reinstatement with DynMcDermott or front pay. Ruling on the defendants' motion to dismiss, the court dismissed Douglas's § 1981 retaliation claim and her § 1985 conspiracy claim, but otherwise allowed her action to proceed to trial.

The jury returned its verdict finding that Douglas was not terminated because of her race or sex, but that she was discharged in retaliation for engaging in activity protected under Title VII. The jury refused to award front pay, but allowed $7,830 in back pay, $238,840 in compensatory damages, and $375,000 in punitive damages.[3]

---

[3]The two verdict forms provide in relevant part:

**VERDICT FORM**

1. Do you find by a preponderance of the evidence that plaintiff's race was a determining factor in DynMcDermott's decision to discharge her?

Yes _____ No __X__

PROCEED TO QUESTION NO. 2.

2. Do you find by a preponderance of the evidence that plaintiff's sex was a determining factor in DynMcDermott's decision to discharge her?

Yes _____ No __X__

PROCEED TO QUESTION NO. 3.

3. Do you find by a preponderance of the evidence that a determinative factor in the plaintiff's discharge was that she engaged in an activity protected by Title VII?

Yes __X__    No _____

PROCEED TO QUESTION NO. 4.

4.    a) Do you find by a preponderance of the evidence that defendant John Poindexter made a defamatory statement about the plaintiff to a third person?

Yes _____    No __X__

IF YOU ANSWERED "NO" TO PART "a," PROCEED TO QUESTION NO. 5.  IF YOU ANSWERED "YES" TO PART "a," PROCEED TO PART "b."

b) Do you find that the statement was privileged, that is made by the defendant in good faith with an interest or duty to a party with a corresponding interest or duty?

Yes _____    No _____

PROCEED TO QUESTION NO. 5.

5.    a) Has plaintiff proven by a preponderance of the evidence that the conduct of defendant John Poindexter was extreme and outrageous?

Yes _____    No __X__

IF YOU ANSWERED "NO" TO PART "a," PLEASE SIGN AND DATE THIS FORM BELOW AND ANSWER NO FURTHER QUESTIONS.  IF YOU ANSWERED "YES" TO PART "a," PROCEED TO PART "b."

b) Has plaintiff proven by a preponderance of the evidence that defendant John Poindexter desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from this conduct?

Yes _____    No _____

[Signed and dated by the jury foreperson]


**VERDICT FORM**

* * *


9

The district court entered judgment for Douglas for $621,670 against DynMcDermott and Poindexter, dismissed all claims against the remaining defendants, and denied front pay and reinstatement after finding that Douglas would have been legitimately terminated for her unethical conduct of gathering internal legal documents before her discharge. The court subsequently amended the judgment to comport with the statutory cap on compensatory and punitive damages under Title VII, which reduced Douglas's final award to $307,830, and memorialized that Douglas prevailed only on her Title VII claim of retaliation against DynMcDermott and Poindexter. All parties appealed.

---

4. a) Do you find that the defendants would have legitimately terminated the plaintiff based on statements made by the plaintiff to Lansing Barrow the day after the audit interview with the plaintiff?

Yes _____ No __X__

PROCEED TO PART "b."

b) Do you find that the defendants would have legitimately terminated the plaintiff for collecting records that belonged to DynMcDermott's legal department prior to her termination on July 7, 1994?

["Yes" written in]

* * *

[Signed and dated by the jury foreperson]

10

III

DynMcDermott[4] argues, in sum, that Douglas disclosed client confidences in her Response Letter, that her actions thus cannot be classified as "protected activity" under Title VII's opposition clause, and that she was terminated because of her unethical disclosures and not because of her participation in any protected activity. Douglas counters that the evidence adduced at trial supports the jury's verdict that she engaged in protected activities and that those activities prompted DynMcDermott to retaliate against her by terminating her employment. Further, in making her own appeal Douglas argues that the district court erred in dismissing her retaliation claim under § 1981 and that we should reinstate the jury's total award of damages because § 1981 has no statutory damages cap.

We need not reach the latter issues because we hold that Douglas's conduct constituted a breach of her duties of confidentiality and loyalty to DynMcDermott, that, accordingly, the conduct was not protected activity as a matter of law, and that DynMcDermott therefore did not unlawfully retaliate against her when it terminated her employment because of that conduct.

IV

---

[4]For convenience, we will refer to both DynMcDermott and Poindexter as DynMcDermott, unless specifically addressing an issue relevant only to Poindexter.

11

We employ a deferential standard of review when examining a jury's verdict for sufficiency of the evidence. <u>Ham Marine, Inc. v. Dresser Indus., Inc.</u>, 72 F.3d 454, 459 (5th Cir. 1995). "Unless the evidence is of such quality and weight that reasonable and impartial jurors could not arrive at such a verdict, the findings of the jury must be upheld." <u>Ham Marine</u>, 72 F.3d at 459. We may not reweigh the evidence, re-evaluate the credibility of the witnesses, nor substitute our reasonable factual inferences for the jury's reasonable inferences. <u>Hiltgen v. Sumrall</u>, 47 F.3d 695, 699-700 (5th Cir. 1995). We must view the evidence in the light most favorable to upholding the jury's verdict and may only reverse if the evidence points "so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary conclusion." <u>Hiltgen</u>, 47 F.3d at 700; <u>Pagan v. Shoney's, Inc.</u>, 931 F.2d 334, 337 (5th Cir. 1991). Questions of law, of course, we review <u>de</u> <u>novo</u>. <u>United States v. O'Keefe</u>, 128 F.3d 885, 893 (5th Cir. 1997), <u>cert. denied</u>, ____ U.S. ____, ___ S.Ct. ___, ___ L.Ed.2d ____, 1998 WL 130816 (1998); <u>Munn v. Algee</u>, 924 F.2d 568, 575 (5th Cir. 1991).

V

A

Douglas is a member of the Louisiana Bar and is thus governed by the Louisiana Rules of Professional Conduct. She is duty-bound,

12

as are all lawyers, not to disclose her client's confidences without authorization and loyally to serve the interests of her client.  Rule 1.6 provides in toto:

> (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in Paragraph (b).

> (b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

> > (1) To prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm; or

> > (2) To establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

Louisiana State Bar Articles of Incorporation, Rules of Professional Conduct, Rule 1.6, La. Rev. Stat. Ann. § 37:219 Ch.4-App., Art. 16 (hereinafter "Ethical Rule" 1.6).[5]  Thus, except under specified limited circumstances, an attorney may not divulge her client's confidences.  See United States v. Cavin, 39 F.3d 1229, 1308 (5th Cir. 1994); Abell v. Potomac Ins. Co., 858 F.2d

---

[5]The ethical rules provide us with guidance in evaluating an attorney's conduct appearing before us as they set out the profession's own articulation of its ethical standards. Brennan's, Inc. v. Brennan's Restaurants, Inc., 590 F.2d 168, 172 n.5 (5th Cir. 1979).

1104, 1124 (5th Cir. 1988) (noting that disclosing material facts to third persons may breach duty to keep confidences as required by good ethics), vacated on other grounds sub nom. Fryar v. Abell, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989).  A "confidence" in this context means exactly what the rule says--any "information relating to representation of a client."  Ethical Rule 1.6(a); see also Brennan's, Inc. v. Brennan's Restaurants, Inc., 590 F.2d 168, 172 (5th Cir. 1979) (noting ethical duty of confidentiality is broader than evidentiary privilege; confidentiality involves all "information" gained in representation, as opposed to "confidence" or "secret").

In addition to the duty of confidentiality, Ethical Rule 1.7 provides that "[l]oyalty is an essential element in the lawyer's relationship to a client."  The duty of loyalty to the client, with which the duty of confidentiality is inherently intertwined, is one of the basic tenets of the legal profession.  Cavin, 39 F.3d at 1308.  The obligations of this profession are not "merely hortatory appeals to [one's] conscience," but enforceable strictures of a lawyer's conduct.  Id.; McCuin v. Texas Power & Light Co., 714 F.2d 1255, 1264-65 (5th Cir. 1983) ("An ethical code is not a garment that lawyers may don and doff at pleasure.").  Violation of one's ethical duties can lead to sanctions as severe as disbarment.

These duties--confidentiality and loyalty--serve to fortify the client's trust placed with the attorney and to ensure the public's confidence in the legal system as a reliable and trustworthy means of adjudicating controversies. See In re American Airlines, Inc., 972 F.2d 605, 618-20 (5th Cir. 1992) ("The trust a lawyer's duty of loyalty inspires in clients encourages them freely to confide in the lawyer and freely to rely on the advice provided by the lawyer.") (citing E.F. Hutton & Co. v. Brown, 305 F.Supp. 371, 395 (S.D. Tex. 1969); Duncan v. Merrill Lynch, 646 F.2d 1020, 1027 (5th Cir. 1981) ("[T]he integrity of the judicial system would be sullied if courts tolerated . . . [the unethical disclosure of confidential information] by those who profess and owe undivided loyalty to their clients.")); McCuin, 714 F.2d at 1265 ("The purpose . . . [of ethical precepts] is to preserve public confidence in the bar and in the legal process.").[6]


B

(1)

---

[6]For a contrary view as to the necessity of the duty of confidentiality, see Daniel R. Fischel, Lawyers and Confidentiality, 65 U. Chi. L. Rev. 1 (Winter 1998) (submitting that the duty of confidentiality is used as an economic incentive that benefits the legal profession more than the client or the public).

Against the backdrop of these declarations demonstrating the obligations of confidentiality and loyalty in a lawyer's relationship with her client, we must first determine whether Douglas breached her professional ethical duties. We therefore turn to the specifics of the information that Douglas disclosed to persons outside DynMcDermott.[7] In her Response Letter, Douglas wrote:

> I wish to deal with one instance specifically. The complaint of Becky R. regarding Brian S. I interviewed Becky and looked at the documentation and wrote a response. I specifically asked John Poindexter if I could speak to Eugene T. and Brian S. I was told No. I turned the letter over to him. I never heard a response. In the performance evaluation meeting, he told me he spoke to Brian S. privately. This is an example of disparate treatment. Brian S. can get a private consultation about something that was documented, but, yet, I am asked to listen more and improve my interpersonal relationships with other employees in writing in a performance evaluation.

She also discussed in some detail her handling of a business matter with BellSouth Mobility on behalf of DynMcDermott. She included in

---

[7]In her brief, Douglas notes that the evidence would not support a finding that DynMcDermott terminated her employment because of the disclosures she made during the EEO audit or in the conversation she had with a DOE officer a day after the meeting. We agree that the evidence is clear that these disclosures were not the basis for DynMcDermott's decision to discharge her. Therefore, like the parties, we restrict our discussion to the information revealed in Douglas's Response Letter that she disseminated to outside parties.

her Response Letter her employer's wishes with respect to the matter and the steps she took in dealing with the file.[8]

The disclosed matters clearly include information that Douglas gained through her representation of her client, DynMcDermott, and is "*information* relating to representation of [that] client." Ethical Rule 1.6(a) (emphasis added). As we have noted before, the "use of the word 'information' . . . is particularly revealing of the drafters' intent to protect all knowledge acquired from a client. . . . This is true without regard to whether someone else may be privy to it." Brennan's, Inc., 590 F.2d at 172. The disclosed matters thus, pursuant to Ethical Rule 1.6 (a), constitute confidences and Douglas divulged them to the DOE. The next question to be considered is whether Douglas's indiscretions amounted to a breach of her duties of confidentiality and loyalty.

(2)

Douglas first contends that her disclosures were justified because she reasonably understood the DOE to be her client along

---

[8]For instance, Douglas noted that when a BellSouth Mobility matter became a problem, DynMcDermott turned the file over to her. She set out in her Response Letter what actions she took with respect to the matter, such as contacting BellSouth Mobility and all of the involved employees and drafting a payment agreement. She also stated that Carol Parrella, presumably employed as part of DynMcDemott's upper management, did not want DynMcDermott's employees to sign the payment agreement and that she drafted a second agreement. All of these disclosures were "information relating to representation of a client" under Rule 1.6 and thus constituted confidential information.

17

with DynMcDermott. This argument is patently implausible. DynMcDermott alone hired her, directed her, and paid her salary. Douglas completely understood that DynMcDermott was her sole employer. There is no evidence that the DOE ever retained or relied on her services as an attorney or that DynMcDermott consented to any dual representation by her. See Ethical Rules 1.7; 1.13 (setting out prerequisites before attorney may consent to dual representation; noting duties specific to corporate counsel).

Douglas had been engaged in the practice of law for almost fifteen years when DynMcDermott hired her. If she is serious in her contention that she considered the DOE to be her client in conjunction with the corporation she was specifically employed to represent, she has a distorted understanding of her professional duty. DynMcDermott was her client; it hired her and paid her. The DOE was not her client; indeed, the DOE was a potential adversary to her client. DynMcDermott therefore reasonably expected her loyally to represent it--which obviously encompassed the expectation that she would not disclose its confidences to third parties.

In the alternative, Douglas argues that because she was instructed as in-house counsel for her former employer, BPS, to treat the DOE as her client, it was reasonable for her to assume that DynMcDermott also desired that she maintain a similar

18

relationship with the DOE when DynMcDermott took over management of the petroleum reserve facilities.  From this assumption, Douglas extrapolates that DynMcDermott consented to the disclosures under Ethical Rule 1.6(a).  That Douglas's former employer may have so consented is irrelevant.  DynMcDermott--her one and only client during the time at issue--did not expressly or impliedly consent to any such arrangement or to the disclosures here involved.  See Ethical Rule 1.6(a).  In sum, Douglas cannot ethically justify her disclosure of client confidences to the DOE under Ethical Rule 1.6(a) because (1) DynMcDermott was her sole client and (2) DynMcDermott did not consent to the disclosures.

(3)

Because she revealed to third parties information relating to her representation of DynMcDermott--i.e., the company's handling of an internal complaint and her dealings with the BellSouth Mobility matter--Douglas breached the duty of confidentiality unless the disclosures fall within one of the limited exceptions in Ethical Rule 1.6(b).  Douglas maintains that she ethically revealed the confidential information because she reasonably believed that the matter she publicized to the DOE was necessary to establish her claims of discrimination in the workplace.[9]  In her Response

---

[9]A second exception allowing disclosure occurs when an attorney reasonably believes it necessary "to respond to allegations in any proceeding concerning the lawyer's

19

Letter, she cited an example of alleged disparate treatment in the company's procedures for handling internal complaints: She received a written report that would be placed in her employment file while "Brian S."--a white male--was only privately reprimanded.[10]

Although we have doubts as to whether Douglas's disclosures of confidential information reasonably were necessary to establish a claim of discrimination, we need not address this issue because she simply was not attempting to establish a "claim or defense" on her behalf in a controversy with DynMcDermott when she provided the DOE officer with a copy of her Response Letter containing client

representation of the client." Ethical Rule 1.6(b)(2). Here, however, when Douglas made the disclosures, no "proceeding" was ongoing between DynMcDermott and Douglas.

Because Douglas represented an organizational client, an additional exception may theoretically be available under Ethical Rule 1.13 ("[I]f a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action . . . in a matter related to the representation that is a violation . . . of law which reasonably might be imputed to the organization, . . . the lawyer shall proceed as is reasonably necessary in the best interest of the organization." Ethical Rule 1.13. Douglas has not urged this section as a basis for her actions in this appeal, however, and we generally do not consider arguments that have not been raised by the parties. United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 n.3 (5th Cir. 1998).

[10]Demonstrating that similarly situated employees were not subjected to adverse employment actions for engaging in conduct identical to that in which the plaintiff engaged may be illustrative of discrimination. Nieto v. L&H Packing Co., 108 F.3d 621, 623 & n.5 (5th Cir. 1997); Barnes v. Yellow Freight Sys., Inc.,778 F.2d 1096, 1101 (5th Cir. 1985). We note, however, that Douglas proffered no meritorious argument justifying her revelations with respect to the BellSouth Mobility matter.

20

confidences. When the DOE officer asked whether he should treat the Letter as a whistle-blower complaint, Douglas responded that he should not do so at that time. This negative answer leads ineluctably to the conclusion that Douglas's disclosures do not fall within the narrow exception contained in Ethical Rule 1.6(b)(2). We thus conclude that the evidence establishes as a matter of law that Douglas breached her duty of confidentiality, and thereby her duty of loyalty, to DynMcDermott.

C

(1)

We must next determine, in the light of our conclusion that Douglas violated her ethical obligations, whether Douglas demonstrated that DynMcDermott unlawfully retaliated against her when it terminated her employment. Title VII imposes liability for unlawful retaliation where (1) the employee engaged in activity protected by Title VII, (2) the employer took adverse employment action against the employee, and (3) a causal connection exists between that protected activity and the adverse employment action. Mattern v. Eastman Kodak Co., 104 F.3d 702, 705 (5th Cir.), cert. denied, ____ U.S. ____, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997); Shirley v. Chrysler First, Inc., 970 F.2d 39, 42 (5th Cir. 1992). The ultimate determination is whether, "but for" the protected conduct, the employer would not have engaged in the adverse

21

employment action.  Long v. Eastfield College, 88 F.3d 300, 305 n.4 (5th Cir. 1996); Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1571 (5th Cir. 1989) (noting employee must prove causation-in-fact); McDaniel v. Temple Indep. Sch. Dist., 770 F.2d 1340, 1346 (5th Cir. 1985) (same).

Activities protected under Title VII fall into two broad categories--opposition and participation.  An employee has engaged in protected activity when she has (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a); Grimes v. Texas Dep't of Mental Health & Mental Retardation, 102 F.3d 137, 140 (5th Cir. 1996).  Douglas claims protection under both prongs.

(2)

(a)

Douglas first contends that she engaged in protected participation when she responded to the DOE officers' questions at the EEO audit and when she disseminated her Response Letter to O'Neill.  As we have suggested *supra* in footnote 7, no evidence indicates that DynMcDermott was motivated to terminate Douglas

22

because of her comments during the EEO audit.[11]  Although clearly unhappy with her remarks at the audit, the evidence shows that DynMcDermott was satisfied to address that matter in its performance review.  Douglas's conduct during the EEO audit is relevant to her discharge only as part of the background to her subsequent response to her performance rating.  We thus focus only on the repercussions associated with Douglas's Response Letter.

(b)

Douglas maintains that her Response Letter also constitutes protected participation because it "should have been forwarded [by the DOE] to the EEOC."  The participation clause affords protection under Title VII by prohibiting retaliation for assistance and participation *in any manner* "in an investigation, proceeding, or hearing" under the statute.  42 U.S.C. § 2000e-3(a); Merritt v.

---

[11]Although the evidence will not support a finding that DynMcDermott was motivated to fire her because of her conduct in the EEO audit, Douglas maintains that sufficient evidence supports a finding that the comments she made in the EEO audit resulted in the "low" rating she received on her evaluation and that her rating is thus evidence of retaliation, albeit not of retaliatory discharge.  This contention is meritless.  In the first instance, DynMcDermott rated her performance as "fully satisfactory."  We find it difficult to ascribe as low a "fully satisfactory" rating.  Second, even were we to allow that the rating Douglas received was "low," the evidence is insufficient to demonstrate that the evaluation itself constitutes an adverse employment action actionable under Title VII.  See Mattern, 104 F.3d at 707; Dollis v. Rubin, 77 F.3d 777, 781-82 (5th Cir. 1995); Landgraf v. USI Film Prods., 968 F.2d 427, 431 (5th Cir.), aff'd, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

23

<u>Dillard Paper Co.</u>, 120 F.3d 1181, 1186 (5th Cir. 1997); <u>Pettway v.</u> <u>American Cast Iron Pipe Co.</u>, 411 F.2d 998, 1006 n.18 (5th Cir. 1969). Douglas, however, specifically instructed O'Neill not to treat the Letter as a whistle-blower complaint. She thus did not participate in an "investigation, proceeding, or hearing" within Title VII's parameters and her five-page Response Letter, informally given to third parties, does not fall within that class of activities protected under the participation clause.

(3)

(a)

Our determination that Douglas's conduct does not qualify for protection under the participation clause does not end our inquiry, however, because we must also consider whether we may fairly characterize the Response Letter as an opposition activity. Douglas's response purports to complain of racism, sexism, and retaliation--all of which Title VII deems unlawful employment practices. As such, the Letter appears to meet the litmus test for activity constituting opposition under Title VII. We thus assume, for the purposes of this opinion, that Douglas's Response qualifies as opposition activity.

Not all activities taken in opposition to an employer's perceived discriminatory practices, however, remain insulated from reprisal under Title VII's shield. <u>Smith v. Texas Dep't of Water</u>

24

*Resources*, 818 F.2d 363, 365-66 (5th Cir. 1987); *Jones v. Flagship Int'l*, 793 F.2d 714, 727 (5th Cir. 1986). We have recognized that some conduct, even though engaged in with the most sincere of intentions, may be so inappropriate as to justify the curtailment of statutorily-afforded safeguards. *Jones*, 793 F.2d at 727.

Our precedents have employed a balancing test to determine whether Title VII's protections may be denied to an employee's activities that adversely affect his effective performance of job duties. *Jones*, 793 F.2d at 727. "'[T]he employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare.'" *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980) (quoting *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 230-34 (1st Cir. 1976)). The yardstick against which the employee's conduct must be measured is the flexible and protean doctrine of "reasonableness in [the] light of the circumstances." *Jefferies*, 615 F.2d at 1036.

For instance, in *Rosser v. Laborers' Int'l Union of North America, Local No. 438*, we held that the plaintiff's form of opposition was unprotected as a matter of law. 616 F.2d 221, 224 (5th Cir. 1980). The plaintiff in that case had been employed as the dues-posting clerk for the secretary-treasurer of the union. After being approached by black union members who felt the union

25

was discriminating against them, Rosser decided to run against her boss for his elected position.  She eventually was disqualified from the race and was discharged from her employment with the union after her boss was re-elected.  Rosser contended that she was fired in retaliation for her engagement in opposition activity.  We agreed that she was fired because of her opposition activity, but we ruled in favor of the defendant on the basis that Rosser's form of opposition--seeking her boss's job--placed her loyalty and cooperation in serious doubt and accordingly fatally diminished her effectiveness as a dues-posting clerk.  Rosser, 616 F.2d at 224. We held that her conduct was thus unprotected under Title VII as a matter of law and that her employer therefore had a legitimate non-discriminatory reason for discharging her.  Id.

We have since reaffirmed Rosser's analysis, noting that "[t]here may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed.  In such a case, his conduct, or form of opposition, is not covered by § 704(a)."  Jones, 793 F.2d at 727 (quoting Rosser, 616 F.2d at 223).

In Jefferies, this court faced a situation that bears some similarity to the conduct found in this case.  The plaintiff was a black female who, while employed by the defendant, copied and

26

disseminated confidential employment records that tended to document her belief that she was a victim of discrimination. After her termination, Jefferies sued for unlawful retaliation, arguing that her conduct was protected because she had been attempting to bring attention to an employment practice that allegedly discriminated against her. Jefferies, 615 F.2d at 1036. After weighing "the employer's right to run his business" against Jefferies's right "to express [her] grievances and promote [her] own welfare," we determined that the plaintiff's form of opposition was unprotected. Id. We noted that Jefferies's conduct was clearly unreasonable in the light of the circumstances and her employer legitimately discharged her because of it. Id.

Jones is yet another of our precedents that have found employee conduct unprotected under Title VII. Just as the conduct in Jefferies is similar to that of Douglas's--publishing confidential information--, the plaintiff's position of trust in Jones is approximate to that enjoyed by Douglas before her termination. Like Douglas, Jones was a licensed attorney hired by Flagship to handle charges of discrimination lodged against it and to represent it before state and federal administrative agencies, including the EEOC. Jones, 793 F.2d at 716. Flagship fired Jones after learning that she had filed a charge of discrimination with the EEOC, had solicited others to join in her suit, and intended to

27

serve as the named representative of a class action against her employer.  We determined that her conduct was unprotected under Title VII because it rendered her ineffective for the position for which she was retained.  <u>Id.</u> at 728.

(b)

These precedents bring us to the immediate case we consider today.  They serve to illustrate that employee conduct, although fairly characterized as protest of or opposition to practices made unlawful by Title VII, may nevertheless be so detrimental to the position of responsibility held by the employee that the conduct is unprotected.  Douglas's behavior fits into this general category.

Furthermore, Douglas's conduct not only undermined her effectiveness as an employee, but her actions also violated the ethical rules of the legal profession.  Here, while employed as in-house counsel for DynMcDermott, Douglas breached her professional duties of confidentiality and of loyalty when she revealed to a third party information relating to the representation of her client.  She took no precautions[12] to preserve

---

[12]Even when revealing confidences falls within an exception to the ethical rules, there are appropriate means for revealing confidences that limit the dissemination of information disclosed. They include requesting <u>in camera</u> review, requesting that the court seal the record in any proceeding, and obtaining permission to prosecute the action without revealing the true name of either party.  <u>See, e.g.</u>, <u>Doe v. A Corp.</u>, 709 F.2d 1043, 1045 n.1 (5th Cir. 1983); <u>United States v. Scott</u>, 909 F.2d 488, 494 n.10 (11th Cir. 1990) (noting different protective measures attorneys may take

the attorney-client relationship and instead acted with thoughtless indiscretion, demonstrating little regard for the ethical obligations inherent in the legal profession. This dereliction of professional duties meant that DynMcDermott could no longer place full trust in her to keep confidences that she may acquire as its attorney. In short, the trust undergirding the attorney-client relationship was broken and Douglas could no longer function in her role as in-house counsel. See Rosser, 616 F.2d at 223 (noting that employee's conduct can so malign the relationship that continued employment is impossible). Her conduct, on the whole, also reflected poorly on the legal profession and its obligation to maintain standards of trust and loyalty.

We therefore turn to the weighing process that our precedents have employed in other similar contexts. We first weigh the importance of the employer's reasonable expectation that its in-house counsel abide by the profession's ethically imposed duties of confidentiality and loyalty. Corporations hire in-house counsel specifically with the expectation that the attorney's loyalty may be fully relied upon. A corporate lawyer is expected to defend her employer-client when adversary proceedings arise and may not, with *very* limited and specified exceptions, act detrimentally to the

---

to protect client confidences when they suspect a client of intending to commit perjury).

29

employer-client's interests.  In fact, by accepting employment, a lawyer chooses to place his loyalties with his employer-client and agrees to act as its confidant and advocate.  An in-house attorney enjoys a unique position of special trust, and her employer-client necessarily occupies a concomitant position of vulnerability with respect to its relationship with its counsel.  The ethical precepts of confidentiality and loyalty serve to assure that that trust is not misplaced and to shield the employer-client from an abuse of the power that the attorney has acquired as a result of her unique position of confidence.  The employer-client's reasonable expectation that its attorney will abide by the profession's ethical edicts is thus entitled to great weight.

In addition to weighing the interests of the employer in determining whether unethical conduct should be protected under Title VII, we, as a court, must also consider the interests of the legal profession, whose members' ethical conduct is critical to the integrity and reputation of the courts and their processes.  It is axiomatic that the legal profession has a vital interest in promoting the ethical conduct of its members, and as strong an interest in discouraging unethical conduct.  These interests would be struck a damaging blow if the law afforded some safe harbor for unethical conduct.  To forgive a breach by allowing the legal protections sought in this case obviously would have repercussions

30

beyond this one case because such a ruling would carve out a class of individual rights that trump professional ethical considerations--and, by extrapolation, could lead to further tolerances with unanticipated consequences to the profession, and thus become yet another bissagiatt.[13]  The particular duties at stake here--confidentiality and loyalty--are of indisputable importance to the attorney-client relationship itself, as this opinion has repeatedly pointed out.  Furthermore, they instill a faith in the system necessary for the public to trust our legal system in the resolution of its disputes--again, as we have made abundantly clear in this opinion.

Furthermore, when an attorney is granted the privilege of joining the ranks of this profession, she agrees to abide by the ethical rules of the profession.  These obligations are fully understood by the attorney and, thus, the profession's expectation that its members will obey its internal canons is also reasonable. Finally, the ethical rule that Douglas breached, with its noted exceptions, is a reasonable rule to require of in-house counsel as well as of the profession generally.

We next weigh an attorney's right under Title VII to oppose allegedly discriminatory practices by her employer.  It is an

---

[13]William Raspberry, *Defining Deficiency Down*, The Washington Post, May 29, 1998, at A27 (coining the acronym "bissagiatt" from the phrase "But It Seemed Such a Good Idea at the Time").

31

extremely important right that we do not gainsay in the least. But in engaging in the balancing exercise here, we must be more specific. The specific right asserted by Douglas is the right to oppose the allegedly unlawful practices of her employer-client, and to do so in such a manner that violates the ethical duties of the legal profession. As we have noted, when Douglas became an attorney, she became bound to abide by the ethical rules of the profession. When she was hired as an attorney by DynMcDermott, she became its defender and advocate. Although she surely did not surrender her Title VII rights when she signed on with DynMcDermott as its in-house counsel--and no one is suggesting that she did-- she did in fact assume professional responsibilities that constrained her exercise of those rights.

Requiring adherence to the profession's ethical precepts does not strip an attorney of all Title VII protections. Indeed, Ethical Rule 1.6 specifically provides for disclosure once disclosure becomes necessary in a dispute with the employer-client. Rule 1.6 surely does not bar Douglas's opposition and protest in her conversations, dialogue, and remonstrations with her employer-client.

In sum, although the right to oppose unlawful practices under Title VII is a right that, independently, is entitled to great weight in the balancing test, the exercise of that right in

violation of the profession's ethical duties of confidentiality and loyalty simply will not counter the weight of the employer-client's rights and the duty owed to the legal profession.

We therefore conclude that when an attorney's Title VII right to oppose her employer-client's allegedly discriminatory practices by disclosing confidential information contrary to the ethical obligations of the profession is balanced against her employer-client's right to ethical representation and the profession's interest in assuring the ethical conduct of its members, the employer's and the profession's interests must prevail. Given the obligations to which an attorney agrees when she joins the profession and when she accepts employment, and the importance of the duties of confidentiality and loyalty to the employer-client and to the integrity of the profession, we hold as a matter of law that conduct that breaches the ethical duties of the legal profession is unprotected under Title VII.[14]

---

[14]Douglas also maintains that the district court erred when it dismissed her § 1981 claim for retaliatory discharge on the basis that such a claim was not cognizable. See Patterson v. McLean Credit Union, 491 U.S. 164, 179-80, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989); Carter v. South Central Bell, 912 F.2d 832, 840 (5th Cir. 1990) (holding that § 1981 does not encompass retaliatory discharge claims). She contends that the Civil Rights Act of 1991 superseded Patterson and Carter and now allows such a claim. We need not reach this issue because, even were employees now able to bring retaliatory discharge claims pursuant to § 1981, we hold as a matter of law that DynMcDermott did not engage in unlawful retaliation when it terminated Douglas's employment because of her conduct that constituted ethical violations of her professional

In reaching this holding, we are aware that the trial court determined that there was "minimal disclosure of any substantive information" and, therefore, that any indiscretion on Douglas's part did not warrant much consideration. This conclusion was error because, as we hold today, *any* betrayal of a client's confidences that breaches the ethical duties of the attorney places that conduct outside Title VII's protection.[15] The employer-client need not tolerate baby steps of unethical conduct while anxiously wondering when and if the giant step will occur, and with what consequences. Once the trust between attorney and client is breached in violation of professionally sanctioned duties, Title VII provides no shield from retaliation.[16]

---

duties.

[15]Conduct that does not constitute a breach of the legal profession's ethically imposed obligations, but that nevertheless adversely impacts the employment relationship between an in-house counsel and her employer-client, remains subject to the balancing test set out in Jefferies and Jones before it may be determined to be unprotected conduct under Title VII.

[16]As is obvious from our opinion, we do not address violations of Title VII against an attorney that, although arising from the same factual scenario, occur independent of the ethical breach. We only make it clear that an attorney who violates her profession's ethical rules is not entitled to any damages flowing from retaliation taken by her employer-client because of her violative conduct. So long as the conduct actually constituted a violation of the profession's ethically imposed duties, the employer is insulated from liability irrespective of whether it took adverse employment action because the conduct constituted a breach or because the conduct was in opposition to discriminatory employment practices. See Rosser, 616 F.2d at 224 (holding opposition

34

VI

For the reasons stated in this opinion, the judgment of the district court is REVERSED and this case is REMANDED to the district court for entry of a judgment of dismissal.

REVERSED and REMANDED for entry of a judgment of dismissal.

---

activity unprotected even though motive for discharge remained disputed).

35