# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
April 8, 2022

Lyle W. Cayce
Clerk

No. 21-30555

Annie J. Daniel,

*Plaintiff—Appellant*,

*versus*

Board of Supervisors for Louisiana State University
Agricultural and Mechanical College,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:21-CV-81

---

Before Stewart, Clement, and Elrod, *Circuit Judges*.

Per Curiam:*

Dr. Annie J. Daniel filed this employment discrimination lawsuit in Louisiana state court against the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU"). Dr. Daniel, who is African American, alleges that she experienced unlawful racism while

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

working at LSU's School of Veterinary Medicine ("LSU SVM"). Allegedly, Dr. Daniel's superiors violated federal and Louisiana laws by subjecting her to racial discrimination, a hostile work environment, and retaliation. LSU removed the case to federal court and moved for summary judgment, which the district court granted. Dr. Daniel timely appealed.

For the reasons that follow, we AFFIRM the district court.

## I. Facts & Procedural History

On January 1, 2014, Dr. Daniel started working for LSU SVM as a clinical track Associate Professor of Veterinary Medical Education and the Director of Veterinary Instructional Design. She was responsible for collecting data to ensure that LSU SVM's curriculum was effective and for working with the faculty to develop sound pedagogical methods. Previously, Dr. Daniel had occupied similar roles at Des Moines University and Tulane University School of Medicine. Dr. Daniel has a Ph.D. in Education, but she is not trained in veterinary science and had never worked at a veterinary school before her appointment at LSU SVM.

Dr. Daniel's supervisor at LSU SVM was Dr. Joseph Taboada, a white man who was then the Associate Dean for Student and Academic Affairs. Dr. Taboada was Dr. Daniel's first point of contact at LSU SVM. He called Dr. Daniel once she applied and invited her to campus for a visit. Dr. Daniel went through a series of interviews on campus, including with Dr. Taboada. She also presented to the faculty on diversity and inclusion. After her campus visit, Dr. Taboada orally extended her an employment offer, which was later formalized in writing.

Dr. Daniel alleges that she faced racial discrimination at LSU SVM, mostly at the hands of Dr. Taboada. First, she says that within a week of starting her job, Dr. Taboada admitted that he "didn't know [she was] Black because [she] didn't sound Black on the phone." Dr. Daniel "just kind of

ignored" this comment but mentally noted that Dr. Taboada "wanted a [w]hite woman" and "did not want a Black woman to work with him."

Next, Dr. Daniel alleges that Dr. Taboada made disparaging remarks about African Americans in her presence. Dr. Taboada generally made these comments during conversations with Dr. Daniel about the lack of racial diversity at LSU SVM. The two frequently discussed African American students and diversity at LSU SVM because they both believed that diversifying the profession was important. Within a few months of Dr. Daniel starting her job, Dr. Taboada told her that African Americans "don't do well" at LSU SVM after she asked why so few had matriculated into the program. He added that "Black [parents] don't expect their kids to go to college . . . [b]ecause they don't go to college themselves." Dr. Daniel responded by explaining that although her parents did not attend college, they pushed her to pursue higher education.

Dr. Daniel compiled a list of similar remarks that Dr. Taboada allegedly made throughout 2014 and 2015. Those remarks included that (1) gifted Black students typically applied to medical school, not veterinary school; (2) most "Black students just cannot keep up with the pace and content" of veterinary school; (3) students from Southern University, the local historically black university, were "not academically strong enough" to attend LSU SVM because Southern University's animal science program was "weak"; and (4) LSU SVM did not want to "burden" Black students "down with student loans." Dr. Daniel considered these and other remarks racist.

Additionally, Dr. Daniel asserts that LSU effectively demoted her by relegating her to clerical work and by taking away her core duties. Allegedly, Dr. Taboada forced her to perform "clerical duties, inputting data, and providing advice—all because she is [B]lack and Dr. Taboada did not want to

take directives from a [B]lack woman." During a 2017 meeting, Dr. Taboada suggested that Dr. Daniel could "copy and paste" faculty lecture schedules into a single document for the Courses and Curriculum Committee to review. Dr. Daniel perceived this as a statement that clerical work was best suited for "the only Black woman in the room." Dr. Daniel also alleges that, in 2018, her duties were reassigned to a white woman, Dr. Heidi Banse, despite Dr. Banse having no training in curriculum design. According to Dr. Daniel, LSU "took the Instructional Design" component of her position and gave it to Dr. Banse. Dr. Daniel further testified that Dr. Banse and Dr. Taboada instituted a "Teaching Academy" for the faculty despite knowing that she was developing a similar program.

Dr. Daniel also alleges that LSU excluded her from training opportunities, declined her requests for staff support, and moved her office into a "closet." On one occasion, Dr. Taboada "sent a group of people to learn about clinical skills" but excluded Dr. Daniel. The individuals sent to that event were all faculty veterinarians. Sometime during her tenure at LSU SVM, Dr. Daniel requested to move to an office outside of student affairs because she could not concentrate there. Dr. Daniel then moved to another office that she says was too small. Throughout her time at LSU SVM, Dr. Daniel requested additional staff support, but administrators denied her requests because the school allegedly lacked the resources to hire additional staff.

Dr. Daniel reported her experiences to administrators several times throughout her tenure at LSU SVM. In May 2017, she discussed her concerns about her relationship with Dr. Taboada and his alleged racist remarks with an LSU Human Resources official, Gaston Reinoso. In response, Reinoso asked Dr. Taboada about Dr. Daniel's allegations and told him that, to the extent that he was making racist remarks, he "needed to stop immediately." Reinoso also advised Dr. Taboada and Dr. Joel Baines, the

Dean of LSU SVM, that they could not retaliate against Dr. Daniel for her allegations. In February 2018, Dr. Daniel reported her concerns about the harassment and discrimination she experienced to the Senior Vice Provost at LSU. On June 4, 2018, Dr. Daniel complained to Reinoso that Dr. Banse and Dr. Taboada were taking over the Teaching Academy. On February 29, 2019, Dr. Daniel communicated to Dr. Baines her anxiety about working with Dr. Taboada. On April 12, 2019, Dr. Daniel filed an EEOC charge alleging discrimination, harassment, and retaliation.

LSU allegedly retaliated against Dr. Daniel for repeatedly reporting what she considered racial discrimination. The retaliatory actions that she identifies include the alleged transfer of her job duties to Dr. Banse, further alleged racist remarks, and two negative performance evaluations. As to the remarks, in August 2019, Dr. Baines allegedly told Dr. Daniel that African American students needed to "prove themselves" to win admission to LSU SVM. She also says that Dr. Taboada made racist remarks throughout 2019 and 2020, including that African Americans are "advised to go to medical school as opposed to veterinary school."

Regarding the evaluations, in 2018, the LSU SVM faculty voted seven-to-one against reappointing Dr. Daniel, apparently because the faculty "d[id] not understand her role." Even so, Dr. Daniel was reappointed and received a rating of "satisfactory" for the year in June 2019. Dr. Daniel considers that evaluation discriminatory, however, because she believes it falsely describes her as "inflexible," which was "almost like" calling her an "angry Black woman." On June 4, 2020, Dr. Daniel received a performance rating of "needs improvement" from Dr. Baines for both 2019 and 2020. Dr. Daniel disagreed with that assessment.

In January 2020, Dr. Daniel sued LSU in Louisiana court alleging violations of federal and Louisiana civil rights laws. She brought

No. 21-30555

discrimination, harassment, and retaliation claims under Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, *et seq.*, and 2000e, *et seq.*, respectively. She also brought claims for violations of Louisiana's anti-discrimination statute, LA. R.S. § 23:301, *et seq.*, and a reprisal claim under Louisiana's whistleblower statute, *Id.* § 23:967. LSU removed the case to federal court. After discovery closed, LSU moved for summary judgment. The district court granted LSU's motion and entered final judgment. Dr. Daniel timely appealed.

## II. STANDARD OF REVIEW

This court reviews orders granting summary judgment de novo, applying the same standard as the district court. *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010). Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted). The court must "view[] all facts and evidence in the light most favorable to the non-moving party." *Moss*, 610 F.3d at 922.

## III. DISCUSSION

On appeal, Dr. Daniel argues that the district court erroneously (1) failed to consider the totality of the circumstances when evaluating her hostile work environment claims; (2) held that she proved neither direct evidence of discrimination nor an adverse employment action for purposes of her discrimination claims; (3) applied the wrong standard to her retaliation

6

No. 21-30555

claim; and (4) dismissed her reprisal claim under Louisiana's whistleblower statute. We address each argument in turn.[1]

*A. Hostile Work Environment*

To establish a hostile work environment claim under Title VII, the plaintiff must show that she (1) belongs to "a protected class"; (2) faced "unwelcome harassment"; (3) the harassment was "based on [her] status as a member of a protected class"; (4) the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment"; and (5) "the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Abbt v. City of Houston*, No. 21-20085, 28 F.4th 601, 2022 WL 764999, at *4 (5th Cir. Mar. 11, 2022) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012)). When assessing whether conduct satisfies the fourth element, this court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hernandez*, 670 F.3d at 651 (quotation omitted). Moreover, "the work environment must be 'both objectively and subjectively offensive.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

Dr. Daniel asserts that the district court erroneously held that she failed to prove severe or pervasive harassment. We disagree. As an initial

---

[1] "Louisiana's anti-discrimination statute . . . is 'substantively similar' to Title VII, and Louisiana courts routinely look to the federal jurisprudence for guidance." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 n.4 (5th Cir. 2007) (quoting *Trahan v. Rally's Hamburgers, Inc.*, 696 So. 2d 637, 641 (La. App. 1st Cir. 1997)). Thus, "the outcome of [Dr. Daniel's] statutory discrimination and retaliation claims will be the same under the federal and state statutes," and "[w]e therefore analyze the issues only under the applicable federal precedents." *Id.*

7

matter, the record contains only one allegedly racist comment that an LSU SVM employee made about Dr. Daniel. In January 2014, Dr. Taboada allegedly told Dr. Daniel that he did not realize that she was Black until her campus visit because she did not "sound Black on the phone." Dr. Daniel "ignored" that comment, and there is no evidence that Dr. Taboada or anyone else at LSU SVM made similar statements later. The other statements in the record, though made in Dr. Daniel's presence, were purported explanations for the lack of diversity at LSU SVM. Those statements thus focused on Black applicants to the school, not Dr. Daniel. Moreover, according to Dr. Daniel, these scattered statements were made over six years. This is not enough to prove a hostile work environment claim under this court's precedents.[2]

At bottom, Dr. Daniel failed to demonstrate harassment that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Abbt*, 28 F.4th at ---, 2022 WL 764999, at *4 (quoting *Hernandez*, 670 F.3d at 651). The statements that she identifies as harassment "pale in comparison, both in severity and frequency, to those found in the cases" that she cites in her brief. *See Turner v. Baylor*

---

[2] *See, e.g.*, *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343, 348 (5th Cir. 2007) (rejecting harassment claim where the plaintiff's supervisor commented about "ghetto children," asserted that African Americans attended "evening classes because they could not qualify for regular [college] admission," and commented on the plaintiff's "shopping habits, car, and son's hobby").

No. 21-30555

*Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007). We thus conclude that the district court properly granted summary judgment on this claim.[3]

### B. Racial Discrimination

Next, we assess whether the district court properly granted summary judgment on Dr. Daniel's racial discrimination claim under Title VII. A plaintiff "may prove a claim of intentional discrimination . . . either by direct or circumstantial evidence." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). "If the plaintiff presents only circumstantial evidence, then she must prove discrimination inferentially using '[t]he three-step *McDonnell Douglas-Burdine* minuet.'" *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 475 (5th Cir. 2015) (citation omitted). But if the plaintiff presents direct evidence, "the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." *Id.* (quoting *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)).

"Because direct evidence is rare, a plaintiff ordinarily uses circumstantial evidence to meet the test set out in *McDonnell Douglas*." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994). "Under that framework, the plaintiff must first establish a prima facie case of discrimination," which requires her to show that she "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer;

---

[3] Dr. Daniel also asserts that the district court erroneously concluded that she experienced racial harassment exclusively from 2014 to 2016 and that her claim was time-barred to the extent it concerned that period. But we need not consider these issues because Dr. Daniel's hostile work environment claim fails for other reasons. *See Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021) ("We may affirm a summary judgment on any ground supported by the record . . . .").

and (4) was . . . treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556. If the plaintiff establishes a prima facie case, the burden "shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *Id.* at 557. If the employer meets that burden, then the plaintiff "bears the ultimate burden of proving that the employer's proffered reason" is "pretext" for unlawful discrimination. *Id.*

### i. Direct or Circumstantial Evidence

Dr. Daniel maintains on appeal that she submitted direct evidence of racial discrimination. "Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption." *Portis*, 34 F.3d at 328–29 (quoting *Brown*, 989 F.2d at 861). When determining whether comments made at work constitute direct evidence, this court looks to whether the alleged comments are "(1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision." *Etienne*, 778 F.3d at 476.

The district court concluded that Dr. Daniel did not offer direct evidence of discrimination and that the *McDonnell-Douglas* framework therefore applied to her claims. It observed that Dr. Daniel relied on argumentation without evidentiary support, overstated the import of record evidence, and failed to demonstrate that any allegedly racist remarks "were related, either substantively or temporally, to the challenged employment decisions in this case."

We agree with the district court. Again, the only allegedly racist remark that was directed at Dr. Daniel was Dr. Taboada's comment that she did not "sound Black on the phone." But that does not "prove, without

inference or presumption, that race was a basis in employment decisions" at LSU SVM, which is "our ultimate focus" at this juncture. *Id.* (quotation and alteration omitted). That is particularly so considering that Dr. Daniel's telephone interview preceded a campus visit that later resulted in Dr. Daniel receiving an employment offer. Moreover, Dr. Daniel does not identify any record evidence showing that this remark, which occurred in January 2014, was connected to the discriminatory employment decisions that allegedly occurred years later. Indeed, the earliest employment decision that Dr. Daniel challenges—her alleged relegation to performing clerical duties— occurred in 2017. Thus, this remark was not "proximate in time to [any] challenged employment decision." *Id.* For the same reasons, even assuming that the various statements about the lack of diversity at LSU SVM concerned Dr. Daniel's race, they are not direct evidence of racial discrimination.

### *ii. Adverse Employment Action*

Lacking direct evidence of discrimination, this court applies the modified *McDonnel Douglas* burden shifting framework. The first step is to assess whether the plaintiff "establish[ed] a prima facie case of discrimination." *McCoy*, 492 F.3d at 556. Among the elements that the plaintiff must show to prove a prima facie case is that she "suffered some adverse employment action by the employer." *Id.* The district court held that Dr. Daniel did not suffer an adverse employment action. On appeal, Dr. Daniel argues that the district court erred.

For purposes of Title VII discrimination claims, "adverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (citing *McCoy*, 492 F.3d at 560). Generally, "the mere 'loss of some job responsibilities'

does not constitute an adverse employment action." *Id.* at 504. "In certain instances," however, "a change in or loss of job responsibilities . . . may be so significant and material that it rises to the level of an adverse employment action." *Id.*

We consider first the alleged transfer of Dr. Daniel's job duties and responsibility for the Teaching Academy to Dr. Banse. To start, although Dr. Daniel's job duties shifted over time, those changes were not "so significant and material that [they] rise[] to the level of an adverse employment action." *Id.* To be sure, Dr. Daniel lost primary responsibility for curriculum design, but that was because "[h]er efforts [had] drifted from" that role. And although Dr. Daniel alleges that Dr. Banse usurped her duties, their roles differed in that Dr. Daniel was a "pedagogical expert" whereas Dr. Banse was a "content expert." Dr. Daniel further alleges that Dr. Taboada relegated her to performing "clerical work" when he asked her to copy and paste material during a meeting. However, being "asked at least once to perform administrative tasks outside her job description does not" prove an adverse employment action. *Price v. Wheeler*, 834 F. App'x 849, 856 (5th Cir. 2020). Lastly, Dr. Banse did initiate the Teaching Academy. But Dr. Daniel had not started the project when Dr. Banse began working on it, and administrators encouraged Dr. Daniel to collaborate with Dr. Banse, which she declined to do. These allegations do not establish an adverse employment action. Indeed, the only case that Dr. Daniel relies on to show otherwise,

*Thompson*, is inapposite because the changes there were substantially more significant.[4]

Nor do Dr. Daniel's other allegations prove adverse employment actions. First, although Dr. Daniel says that the faculty voted against reappointing her in 2018 and that she received a poor evaluation in 2018, the record confirms that she was nonetheless reappointed in 2018 and that she received a "satisfactory" rating that year. Only the evaluation she received in June 2020 for the 2019 year rated her as needing "improvement." However, "a low performance evaluation alone is not an adverse employment action." *Johnson v. McDonald*, 623 F. App'x 701, 704 (5th Cir. 2015) (citing *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 373 n.11 (5th Cir. 1998)). Second, Dr. Daniel complains that she was moved into a closet. But Dr. Daniel requested to move to a different office, and the record lacks any evidence showing that Dr. Daniel's new office was a "closet," even if it was smaller than she preferred. Third, the only missed training opportunity that Dr. Daniel cites involved an opportunity in which all the individuals selected for the program were veterinarians, unlike Dr. Daniel. Finally, Dr. Daniel complains that she was denied staff support, but Dr. Daniel knew when she joined LSU SVM that she would receive less support than she previously enjoyed. Further, it is undisputed that Dr. Daniel received a graduate assistant in 2018. We therefore conclude that

---

[4] In *Thompson*, this court reversed the dismissal of a discrimination claim for failure to allege an adverse employment action. 764 F.3d at 502. The plaintiff, a Black man employed as a detective, alleged that his employer barred him from searching for or logging evidence, working undercover, giving statements in criminal cases, visiting crime scenes, or leading investigations. *Id.* Those allegations plausibly showed that the plaintiff "no longer occupie[d] the position of a detective" and instead "function[ed] as an assistant to other detectives." *Id.* at 505. Accordingly, his position had become "objectively worse" such that "he was subject to the equivalent of a demotion." *Id.* (quotation omitted).

No. 21-30555

Dr. Daniel's discrimination claim fails because she did not show an adverse employment action.

*C. Retaliation*

We now turn to Dr. Daniel's claim that LSU retaliated against her for reporting racial discrimination and harassment in violation of Title VI[5] and Title VII.[6] To prove a retaliation claim, a plaintiff must establish that (1) she "engaged in conduct protected by Title VII"; (2) she "suffered a materially adverse action"; and (3) "a causal connection exists between the protected activity and the adverse action." *Cabral v. Brennan*, 853 F.3d 763, 766–67 (5th Cir. 2017) (quoting *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015)).

The parties dispute whether Dr. Daniel satisfied the second element. An employment decision constitutes a materially adverse action if "a reasonable employee would have found the challenged action materially adverse," meaning that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 767 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

---

[5] We assume without deciding that Title VI encompasses a retaliation claim, *see Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 n.4 (5th Cir. 2020), and that the same elements are necessary to sustain such a claim under both Titles VI and VII, *see Jones v. S. Univ.*, 834 F. App'x 919, 923 (5th Cir. 2020) (applying the Title VII retaliation standard to a Title VI claim) (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003); *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 238 (5th Cir. 2020) (per curiam)).

[6] Dr. Daniel also brought a claim for reprisal under Louisiana's whistleblower statute, La. R.S. § 23:967. Although Dr. Daniel argues that this statute offers broader protection against retaliation than does Title VII, "our precedent, and that of the Louisiana state courts, has consistently cited to Title VII standards in interpreting § 23:967." *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 415 (5th Cir. 2018). Accordingly, this court has applied "the standards and requirements of Title VII when analyzing . . . retaliation claims under § 23:967." *Id.* We do so again here.

This definition is "slightly" broader than the definition that applies to an adverse employment action for purposes of a Title VII discrimination claim. *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019). Thus, although "Title VII's anti-retaliation provisions do not protect employees from 'petty slights, minor annoyances, and simple lack of good manners,'" a "retaliatory adverse employment action[] . . . need not rise to the level of [an] ultimate employment decision[]." *Id.* at 827 (quoting *Burlington*, 548 U.S. at 67–68).

To prove that she suffered materially adverse action, Dr. Daniel cites the same allegations that she offered to show that she suffered an adverse employment action for purposes of her Title VII discrimination claim. We concluded above that those allegations failed to establish unlawful discrimination. Here, "[w]e similarly hold that the definition applied to retaliatory adverse employment actions still does not encompass any of these allegations." *Id.* at 828. Accordingly, the district court properly dismissed Dr. Daniel's retaliation claims.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court.