REVISED, December 16, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-30883

_____

KORDICE M. DOUGLAS,

                              Plaintiff - Appellee-Cross-Appellant,

                         versus

DYN McDERMOTT PETROLEUM OPERATIONS
COMPANY; JOHN POINDEXTER,

                              Defendants - Appellants-Cross-Appellees.

----------------------------------

Appeals from the United States District Court for the
Eastern District of Louisiana

----------------------------------
December 15, 1998

ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC
**144 F.3d 364 (5th Cir. June 18, 1998)**

Before JOLLY, DAVIS, and BARKSDALE, Circuit Judges.

PER CURIAM:

The order of July 23, 1998, denying rehearing and rehearing en banc is rescinded and this order is substituted in its place.

The petition for rehearing is DENIED and the court having been polled at the request of one of the members of the court and a majority of the judges who are in regular active service not having voted in favor, the suggestion for rehearing en banc is also DENIED.

BENAVIDES, Circuit Judge, with whom POLITZ, Chief Judge and STEWART, Circuit Judge, join, dissenting:

I would grant rehearing en banc to allow the en banc court to address the important and substantive issues identified in the dissent filed by Judge Dennis.

ENDRECORD

DENNIS, Circuit Judge, with whom PARKER, Circuit Judge, joins, dissenting.

I dissent from the refusal to rehear this case en banc.

The panel opinion clashes with the Supreme Court's *McDonnell Douglas-Burdine-Hicks*[1] framework for the trial of Title VII intentional discrimination cases, as well as our en banc adoption and explanation of the framework in *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989 (5th Cir. 1996) (en banc). Instead of following controlling precedents, the panel opinion uses a free-wheeling, legislative-like balancing process to fashion a mandatory rule of law, *viz.*, any employee who is a lawyer loses Title VII protection when she reveals any employment-related information while opposing an unlawful employment practice; and proceeds to apply this rule to facts found by the panel itself directly from the record, in complete disregard of the panel's duty to test the jury verdict under our *Boeing v. Shipman*[2] standard as required by our en banc decision in *Rhodes.* The panel opinion also overrules or undermines prior panel decisions in *Doe v. A Corporation*[3], which held that ethical rules cannot be asserted to preclude a lawyer's access to

---

[1] *McDonnell Douglas v. Green,* 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248 (1981); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993).

[2] *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (en banc), *overruled in part on other grounds, Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir. 1997) (en banc).

[3] *Doe v. A Corp.,* 709 F.2d 1043 (5th Cir. 1983).

courts for the adjudication of his personal rights and tenable legal claims against his former employer, and *Jones v. Flagship*[4], which expressly recognized a lawyer's right to pursue her own personal Title VII claim against her employer and to have a full and fair opportunity under the *McDonnell Douglas-Burdine* framework to demonstrate that the employer's proffered reasons for adverse employment actions were a pretext for unlawful discrimination.[5]

I will set forth my understanding of the case and the reasons that I believe a correct application of the statute and the doctrine of stare decisis should not result in setting aside the jury's verdict for the plaintiff or a reversal and remand for entry of a judgment of dismissal.

## I. STATEMENT OF THE CASE

Kordice Douglas, a black woman, was an in-house attorney-employee of DynMcDermott Petroleum Operations Company (DPO). DPO was a government contractor performing services for the Department of Energy (DOE).

---

[4] *Jones v. Flagship Int'l*, 793 F.2d 714 (5th Cir. 1986), *cert. denied,* 479 U.S. 1065 (1987).

[5] The panel opinion also incorrectly interprets Louisiana State Bar Association Rule of Professional Conduct 1.6 to require the filing of a formal complaint by a lawyer in an administrative or judicial tribunal against her client in order for there to be a recognizable controversy with the client that would allow the lawyer to reveal confidential information when it is necessary to do so to enforce or defend her own personal rights or to defend herself against an accusation of wrongful conduct.

Between April 13 and July 18, 1994, the DOE conducted an appraisal of DPO's Equal Employment Opportunity /Affirmative Action program to assure that DPO was complying with Federal EEO laws. The DOE appraisal was authorized by the DOE-DPO government contract; Executive Order No. 11246, as amended, *reprinted as amended in* 42 U.S.C. § 2000(e) note; 41 C.F.R. § 60-1 *et seq.*; FAR 52.222-26; DOE Order No. 3220.2A. The appraisal consisted of a review of DPO documents and interviews with a randomly selected group of DPO employees.[6]

The government's contract between the DOE and DPO provided that "[a]ll records acquired or generated by the contractor [DPO] under this contract in the possession of the contractor, including [performance appraisals, reviews, and associated documents, equal employment opportunity and affirmative action claims and records, files and records concerning ethics and security investigations, and attorney-client privilege or attorney work product] shall be subject to inspection, copying and audit by the government at all

---

[6] *In preparation for the appraisal, DOE requested DPO to complete a questionnaire and turn over certain of its documents. Among the documents requested were: "List of EEO-related complaints and disposition actions(s) taken since contract inception (including those actions pending after taking over from Boeing Petroleum Services, Inc.)"; "Job group summary by race and sex as of October, 1993 and March, 1994"; and "Organizational charts by pay code, race, sex[.]"*

reasonable times[.]" Therefore, DPO expressly waived its rights of confidentiality and privilege with respect to these documents.[7]

On June 8, 1994, during the appraisal, the DOE appraisal team met with John Poindexter, who was DPO's general counsel and Douglas's supervisor. Douglas was not scheduled or prepared to attend the meeting. After the meeting was underway, however, Poindexter sent for Douglas and instructed her to answer some questions for the DOE team. Poindexter did not apprise Douglas of the questions she would be asked or how she should answer them. According to Douglas, she responded to all of the questions by the DOE team honestly and correctly to the best of her knowledge and understanding. DOE auditors O'Neill, Barrow and Rochon also testified at trial that Douglas's answers were responsive to their questions. Unbeknownst to Douglas, Poindexter had called her into the meeting because he could not answer some of the DOE team's questions about his own office's procedures. When team member Dick O'Neill asked her several questions touching on more substantive EEO matters, however, she also answered them truthfully and

---

[7] *The statement to the contrary in DPO's brief is incorrect: "The controlling contract neither required DynMcDermott to waive any rights of confidentiality or privilege, nor did it give DOE an unlimited right to seek or obtain confidential or privileged information from DynMcDermott." The related statement in the panel opinion is misleading: "DynMcDermott neither implicitly nor explicitly waived any of its rights of confidentiality or privilege with respect to its in-house counsel." Douglas v. DynMcDermott Petroleum Operations Co.,* 144 F.3d 364, 366 (5th Cir. 1998), *petition for cert. filed,* 67 U.S.L.W. 3302 (Oct. 20, 1998) (No. 98-673).

accurately within her understanding. Douglas testified that she later learned that Poindexter, who sat by silently and impassively during her interrogation, was disappointed and embarrassed by several of her responses. It may be fairly inferred that Poindexter, who was already embarrassed by his inability to answer procedural questions, was further upset because Douglas's unrehearsed answers were in some respects inconsistent with his understanding of circumstances involving DPO's EEO program that he wished to present to the DOE team.[8]

---

[8] *These questions and answers, Douglas testified, were as follows:*

> *[O'Neill] said, "Kordice, we're conducting the audit. We've received a lot of complaints at DOE and that's why we're conducting the audit." He said, "Were you aware of all these complaints?" So I said, "No, I'm not aware of all the complaints. What complaints are you talking about?" So he said, "We've had a number of people to complain." I said, "Well," I said, "If you have all those people complaining, it's just a class action wait[sic] to happen." And I said, "No, I'm[sic] wasn't aware that you had that many employees complaining."*

*These statements were repeated without change in substance during her testimony.*

> *[O'Neill] said, "Were you aware of the women at the sites with the equal pay claim?" So I said, "No, I'm not aware of any equal pay claim with the women at the sites," but, I said, "I'm well aware of the equal pay situation." And I said, "Maybe I'll get my money now," something jokingly, and they just smiled and went on to the next question.*
> \* \* \*

> *They also asked me was I aware of the leaks in*

the human resources department.  They had many complaints from employees about leaks in the human resources department, and I took up for the human resources department.  I told them that it was unfair to criticize the human resources department, when employees were going back to their desks discussing the problem.  And I specifically mentioned an employee, Becky S., even though I didn't call her name in the interview, and that she was standing out in the hall, telling people about their problems.

Poindexter recalled Douglas's responses to the questions of the DOE appraisal team somewhat differently.  According to Poindexter:

Well, they started asking her specific details about certain situations. . . . We had a situation where some women employees at one of the sites, who were performing exactly the same task as the men, were being paid less, and that was brought to our attention. . . . DynMcDermott had resolved it.  We, in fact, increased the salary of the women because it was a legitimate complaint.  So she started explaining that issue -- I mean, they were asking her what she knew about an equal pay situation at the sites, and she said, well, she really didn't know. And they looked at me and they said, "Do you know about that?"  And I said, "Yes."  Mr. Turner had talked to me about the situation and I was aware of it. But when they asked her is when she gave the statement, "No, I don't know about it, but maybe I'll get my money now."

***

There was a another problem with regard to leaks in the HR department, and she responded to the leaks in the HR department.  Then the issue that came up was --- I don't really remember how it came up, but the subject was does she think the employees were satisfied with resolution of EEOC complaints.  At that point in time is when she went into her explanation of, "No, but I'll tell you

8

Significantly, no harm whatsoever to DPO resulted from Douglas's statements. O'Neill and JoAnn Rochon, two DOE team members who testified at the trial, could not even recall that Douglas had said anything about a class action, human resources leaks, specific employees or specific employee complaints or cases. Lansen Barrow, another DOE attorney on the audit team, testified that he could not recall Douglas commenting on specific employees or cases. According to O'Neill, the DOE team told Douglas that some of the female employees they had interviewed believed that they were not paid on an equal basis with men, although they had not filed any claims, and asked if she had any knowledge of that. Although he could not recall exactly what she said, he stated that Douglas's "response indicated to me that it either was a personal issue or a real -- something she was quite interested in."

On June 22, 1994, after two weeks' silence and without previous notice, Poindexter called Douglas into his office and handed her her first written performance evaluation as a DPO employee. According to Douglas, Poindexter said, "Kordice, I know you're going to think I'm being hard on you and I probably was, but during the audit you made me look stupid and got the company in

---

*what. We have these plaintiffs' attorneys coming into contact with our employees, who are getting information from our employees, and they're just a class-action lawsuit waiting to happen."*

9

trouble." The evaluation was critical of Douglas's judgment during the DOE's EEO appraisal. Poindexter gave Douglas a rating of "Improvement Needed" under the "Judgment" category of the performance evaluation, and at Douglas's request, Poindexter agreed to add the handwritten notation "EEO Audit" next to the poor rating. Poindexter also commented in the written evaluation that Douglas needed to "focus on issues when dealing in audits and interviews." Poindexter also gave Douglas an "Improvement Needed" rating under the category "Perceptual and Analytical," and at Douglas's request, added the handwritten notation "Bell South" next to the poor rating. Douglas testified that during her evaluation Poindexter told her that he and Jocelyn Guarisco, DOE chief counsel, had discussed Douglas's statements during the meeting with the DOE team. According to Douglas, Poindexter also said that he and Guarisco had decided that she had committed a breach of professional ethics but would not explain the exact nature of the violation. The evaluation resulted in an overall rating of "Fully Satisfactory," which Douglas perceived to be a severely harmful downgrading because it was only one grade above the lowest rating and two grades below the top grade of "Excellent," which she thought she deserved and needed to maintain as a professional employee.

Because Douglas perceived the performance evaluation rating to be the result of sexual, racial and retaliatory discrimination, she filed a written "Response To Retaliatory Performance Evaluation" on

June 24, 1994, complaining of alleged unlawful employment practices. She sent the written response to Poindexter, other DPO executives, and O'Neill who was DOE's EEO whistle-blower officer designated to receive EEO complaints from DPO employees and forward those complaints to the EEOC. In the response she made two statements that DPO contends were disclosures of the confidences of her employer-client, DPO, to a third person, *viz.*, Dick O'Neill, as follows:

> I was given a negative rating on Perceptual and Analytical. The only instance that was pointed out to me was the Bell South Mobility issue [-- concerning the problem of the personal use of DPO cellular phones by DPO and DOE employees]. Randy [another DPO in-house attorney] and John worked this project. After it became a problem the file was turned over to me. I contacted Bell South Mobility and all of the employees involved. I drafted a payment agreement and showed it to John Poindexter. He told me that Carol Parrella did not want the DM [DPO] employees to sign this agreement because the DOE employees could not be forced to sign the agreement. . . . Finally, he called Chuck Herring [DPO vice-president and deputy project manager] and they discussed the matter. No follow up was given to me. . . . I drafted a new agreement, followed up with Bell South Mobility. I have records of the phone calls. I even noticed a mathematical error on the bill and pointed it out to John Poindexter and Bell South Mobility. The employees I spoke to and Bell South Mobility can verify that I spoke to them. Therefore, I cannot understand this low score. . . .
>                     * * *
>
> I wish to deal with one instance specifically. The complaint of Becky R. regarding Brian S. I interviewed Becky and looked at the documentation and wrote a response. I

specifically asked John Poindexter if I could speak to Eugene T. and Brian S. I was told No. I turned the letter over to him. I never heard a response. In the performance evaluation meeting, he told me he spoke to Brian S. privately. This is an example of di[s]parate treatment. Brian S. can get a private consultation about something that was documented, but, yet, I am asked to listen more and improve my interpersonal relationships with other employees in writing in a performance evaluation. . . .

Douglas testified that, after O'Neill received his copy of her response, he told her on June 24, 1994 that she had a whistle-blower complaint and asked whether she was making such a complaint. She testified that she said, "I have to talk to my attorney first and I will get back to you. I don't know what I want to do at this point. I have to talk to my attorney first, but I want you to have a copy because you were one of the auditors and I will get back with you later after I talk to my attorney."[9]

---

[9] *The panel opinion incorrectly and improperly finds de novo* that "Douglas . . . specifically instructed O'Neill not to treat the Letter as a whistle-blower complaint." *Douglas,* 144 F.3d at 373. The panel's conclusion that Douglas's response letter did not constitute protected participation is thus based on a faulty factual premise. More important, the panel overlooks that "the focus is not on whether the employee intends to follow through with filing the charge, but rather on whether the employer's decision to discharge was motivated by an improper desire to retaliate against an employee for pursuing rights granted by the Act." *Polk v. Yellow Freight Syst., Inc.,* 801 F.2d 190, 200 (6th Cir. 1981) (an employee's <u>visit</u> to a Civil Rights Commission to inquire about rights under the Act is a protected activity); *see also Gifford v. Atchison, Topeka & Santa Fe Ry.,* 685 F.2d 1149, 1156 n.3 (9th Cir. 1982) ("no legal distinction . . . between . . . filing of a charge . . . and threatening to file a charge.").

DPO terminated Douglas's employment on July 7, 1994, before Douglas could confer with her attorney, who was on vacation. DPO gave Douglas no explanation for her termination, but offered her "transition funds" if she would sign a release waiving her right to sue DPO. On or about July 11, 1994 Douglas filed a claim with the EEOC alleging that DPO had retaliated against her for her opposition to practices made unlawful under Title VII. The EEOC issued a right-to-sue letter and she timely filed an action against DPO in the federal district court. After a jury trial, the district court correctly instructed the jury on the law, including the elements that a plaintiff must prove to establish a prima facie case of retaliation, the defendant's burden of rebutting the plaintiff's prima facie case by offering a legitimate non-discriminatory reason for termination, and the plaintiff's burden to prove that any non-discriminatory reason for termination offered by the defendant was a pretext, cloak or cover for retaliation. The court also instructed the jury on the Louisiana Rules of Professional Conduct, one of which prohibits a lawyer from revealing information relating to representation of a client except to the extent the lawyer reasonably believes it necessary to establish a claim or defense in behalf of the lawyer in a controversy between the lawyer and the client or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

13

The jury rendered a verdict in favor of Douglas, finding that a determinative factor in her discharge was that she engaged in an activity protected by Title VII, and awarding her compensatory and punitive damages and back pay. The district court reduced Douglas's award to $307,830 in accordance with the statutory cap and denied DPO's motion for a judgment as a matter of law or remittitur and denial of punitive damages with written reasons.

## II. DISCUSSION

### A. Departure From *McDonnell Douglas* Framework

The panel opinion overrules, in part, the Supreme Court's *McDonnell Douglas-Burdine-Hicks* framework for production and proof in Title VII cases (and our en banc decision in *Rhodes v. Guiberson* adopting and explaining the framework) by creating an anomalous new mandatory rule of law, *viz.*, that the employer's production of evidence that an attorney-employee, in her opposition activity, revealed any confidential employment-related information, does not merely dispel the presumption created by the employee's prima facie case that the employer discriminated against the attorney-employee because of her opposition; instead it automatically and conclusively destroys Title VII's protection against employer retaliation for the employee's opposition activity; unlike all other employees, an attorney is deprived of the opportunity guaranteed by the *McDonnell Douglas* framework to demonstrate that

14

the employer's proffered reason for adverse employment action was a pretext or coverup for retaliation.

## 1. The *McDonnell Douglas-Burdine-Hicks-Rhodes* Framework

With the goal of "progressively sharpen[ing] the inquiry into the elusive factual question of intentional discrimination," *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)), the Supreme Court in *McDonnell Douglas* "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *Id.; Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 992 (5th Cir. 1996) (en banc). The plaintiff first must establish, by a preponderance of the evidence, a "prima facie" case of discrimination. *See Hicks,* 509 U.S. at 255 (citing *Burdine,* 450 U.S. at 252-53); *Rhodes,* 75 F.3d at 992. Establishment of such a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *Hicks,* 509 U.S. at 255; *Burdine*, 450 U.S. at 254; *Rhodes,* 75 F.3d at 992. This presumption places on the defendant the burden of producing evidence that the challenged employment action was taken for a legitimate, nondiscriminatory reason. *Hicks,* 509 U.S. at 507; *Burdine,* 450 U.S. at 254; Rhodes, 75 F.3d at 992-93. The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *"if believed by the trier of fact,"* would support a finding that unlawful discrimination was not the cause of the employment action.

*Hicks,* 509 U.S. at 507; Burdine, 450 U.S. at 254-55; *Rhodes*, 75 F.3d at 993.

"[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." *Hicks,* 509 U.S. at 509. "For the burden-of-production determination necessarily *precedes* the credibility-assessment stage. At the close of the defendant's case, the court is asked to decide whether an issue of fact remains for the trier of fact to determine." *Id.* (italics in original).

If the defendant succeeds in carrying its burden of production, the presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture, and the trier of fact proceeds to decide the ultimate question of whether the plaintiff has proved that the defendant intentionally discriminated against her. *Id.* at 511; *Burdine,* 450 U.S. at 253; *Rhodes*, 75 F.3d at 993. The plaintiff now must have "'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision," and that unlawful discrimination was. *Hicks*, 509 U.S. at 507-08 (quoting *Burdine,* 450 U.S. at 256); see *Rhodes,* 75 F.3d at 993. Thus, the requirement that the employer produce evidence clearly setting forth its reasons for the challenged employment action gives the

16

plaintiff a "full and fair" rebuttal opportunity. *Hicks,* 509 U.S. at 516 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973) ("[O]n the retrial respondent must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision. We . . . insist that respondent . . . must be given a full and fair opportunity to demonstrate by competent evidence that whatever the stated reasons for his rejection, the decision was in reality racially premised.")); *Burdine,* 450 U.S. at 255; *see Rhodes*, 75 F.3d at 993.

In summary, (1) the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case that the employer's employment action constituted unlawful discrimination; (2) the prima facie case creates a presumption of discrimination in favor of the plaintiff; (3) if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to produce evidence which, if believed by the trier of fact, would support a finding that the employer had a legitimate, nondiscriminatory reason for the employment action; (4) if the defendant succeeds in producing such evidence, the presumption of discrimination disappears; (5) the plaintiff now must be afforded the opportunity to prevail without the benefit of the presumption, however, by proving by a preponderance of the evidence that the employer's proffered reason for the employment action was not its real reason, but a pretext or coverup, and that in reality the employer's

challenged employment action was intentional unlawful discrimination against the plaintiff.

**2. The Panel Opinion's New Rules of Law Override and Attempt to Amend, in Legislative Fashion, the *McDonnell Douglas-Burdine-Hicks-Rhodes* Line of Decisions**

The panel opinion announces several broad mandatory rules of law. First, it "hold[s] as a matter of law that conduct that breaches the ethical duties of [her state's] legal profession is unprotected under Title VII." *Douglas*, 144 F.3d at 376. Second, "[A]ny betrayal of a client's confidences that breaches the [state] ethical duties of the attorney[, including a "minimal disclosure of any substantive information,"] places that conduct outside Title VII's protection." *Id.* Third, "So long as the [attorney-employee's] conduct actually constituted a violation of the profession's ethically imposed duties, <u>the employer is insulated from liability irrespective of whether it took adverse employment action because the conduct constituted a breach or because the conduct was in opposition to discriminatory employment practices</u>." *Id.* at 377 n.16. (underscoring added). Fourth, the defendant is entitled to the entry of a judgment as a matter of law dismissing the plaintiff's case, if the plaintiff's opposition conduct involved a breach of her state's ethical rule. *Id.* at 376. It is self-evident, however, that none of the panel's new rules of law

18

can be reconciled with the Supreme Court's *McDonnell Douglas* line of cases or our en banc decision in *Rhodes*.

The holdings and underlying rationale of the panel opinion are at odds with the *McDonnell Douglas* "basic allocation of burdens and order of presentation of proof in a Title VII case. . . [,]" *Burdine*, 450 U.S. at 252, "[that] serves to bring the litigants and the court expeditiously and fairly to th[e] ultimate question [of whether the defendant intentionally discriminated against the plaintiff]." *Id.* at 253. The panel opinion erects a barrier across the *McDonnell Douglas* framework for employees who are attorneys, which unfairly truncates the order of proof and presentation and permits their cases to be disposed of on issues of legal ethics rather than on the ultimate Title VII question of whether the employer's action was a product of unlawful discrimination. Nothing in law permits a court to create such a legal barrier or to make such a substitution of the ultimate issue under the statute. Just as "Title VII is not a cause of action for perjury," *Hicks,* 509 U.S. at 514-15, 521, it is not a lawyer disciplinary proceeding either; "we have other civil and criminal remedies for that." *Id.* at 521; see also *Doe v. A Corp.,* 709 F.2d 1043, 1050 (5th Cir. 1983).

The panel opinion seems to assume that its judicial inventiveness is justified because particular kinds of employee conduct are so reprehensible that Courts of Appeals may simply abandon the *McDonnell Douglas* framework and declare that as a

19

matter of law Title VII protection is unavailable to those who engage in such conduct while opposing unlawful employment practices. From the beginning, however, the Supreme Court in *McDonnell Douglas* made it clear that employee conduct during a protest of unlawful employment practices, even unlawful and potentially harmful conduct, cannot be used by the employer as a pretext or coverup for discriminatory adverse employment action against the employee. In *McDonnell Douglas,* the plaintiff had pleaded guilty to the deliberately unlawful and potentially very harmful activity of taking part in a carefully planned "stall-in" designed to block access and egress at the defendant's plant during a peak traffic hour to protest allegedly discriminatory employment conditions. The Supreme Court held that while "[n]othing in Title VII compels an employer to absolve and rehire one who has engaged in such deliberate, unlawful activity against it[,]. . . neither does it permit [the employer] to use [the employee or applicant's] conduct as a pretext" for unlawful discrimination prohibited by Title VII. *McDonnell Douglas*, 411 U.S. at 803-04. Moreover, the Court insisted, "[the employee or applicant] must be given a full and fair opportunity to demonstrate by competent evidence that whatever the stated reasons for his rejection, the decision was in reality [based on unlawful discrimination.]" *Id.* at 804, 807 ("[R]espondent must be afforded a fair opportunity to demonstrate that petitioner's assigned reason for refusing to re-employ was a pretext or discriminatory in its application."). These principles

20

have been reiterated fully and firmly by the Supreme Court and this court en banc as essential parts of the *McDonnell Douglas-Burdine-Hicks-Rhodes* framework.

Consequently, the rules of law announced by the panel opinion to the effect that an attorney-employee's unethical conduct, *per se* and *as a matter of law,* places the employee's opposition to unlawful employment practices outside the protection of Title VII are manifestly contrary to the Supreme Court decisions and our own en banc decision. The third and fourth rules of the panel opinion, in particular, are diametrically opposed to the plain statements and holdings of the Supreme Court and this court en banc. Instead of heeding the Supreme Court's insistence that the plaintiff be accorded a full and fair opportunity to demonstrate that the defendant's proffered reason for the challenged employment action was not its real reason, but that the defendant's discriminatory retaliation for opposition to unlawful employment practices was, the panel opinion flatly deprives the plaintiff of such an opportunity by holding that the employer's true reason, even if it was unlawful discrimination, is irrelevant so long as the employee's conduct actually violated a rule of professional ethics. *Compare Douglas*, 144 F.3d at 377 n.16 ("So long as the [employee's] conduct actually constituted a violation of the profession's ethically imposed duties, the employer is insulated from liability <u>irrespective of whether it took adverse employment action because</u> <u>the conduct constituted a breach or because the conduct was in</u>

opposition to discriminatory practices.")(emphasis added) *with*
*McDonnell Douglas*, 411 U.S. at 805 n.18 ("We do. . . insist that
[the plaintiff]. . . must be given a full and fair opportunity to
demonstrate by competent evidence that whatever the stated reasons
for his rejection, the [employer's] decision was in reality
[discrimination]."). *See also id.* at 807 ("[The plaintiff] must be
afforded a fair opportunity to demonstrate that petitioner's
assigned reasons for refusing to re-employ was a pretext or
discriminatory in its application.  If the District Judge so finds,
he must order a prompt and appropriate remedy."); *Burdine*, 450 U.S.
at 253 ("[S]hould the defendant carry this burden, the plaintiff
must then have an opportunity to prove by a preponderance of the
evidence that the legitimate reasons offered by the defendant were
not its true reasons, but were a pretext for discrimination.");
*Hicks*, 509 U.S. at 507-08 ("The plaintiff then has 'the full and
fair opportunity to demonstrate,' through presentation of his own
case and through cross-examination of the defendant's witnesses,
'that the proffered reason was not the true reason for the
employment decision,' and that [discrimination] was.  He retains
that 'ultimate burden of persuading the [trier of fact] that [he]
has been the victim of intentional discrimination.'") (citations
omitted); *Rhodes*, 75 F.3d at 993 ("[T]he plaintiff is accorded the
opportunity to demonstrate that the defendant's articulated
rationale was merely a pretext for discrimination.").

22

When an appropriate factfinder determines, according to proper procedures, that the employer has unlawfully discriminated, this court has no authority to declare that employer immune from liability as a matter of law for the sole reason that the employee committed a breach of ethics in opposing unlawful employment practices. The Supreme Court has recognized that even it cannot engraft such substantive rules upon the statute:

> We may, according to traditional practice, establish certain modes and orders of proof, including an initial rebuttable presumption of the sort we described earlier in this opinion, which we believe *McDonnell Douglas* represents. But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.

*Hicks*, 509 U.S. at 514. By the same token, nothing in the law permits this court to substitute, for the Congressional requirement of a prompt and appropriate remedy for a proven victim of an employer's unlawful discrimination under Title VII, this court's own rule of absolute immunity for employers in every case in which an attorney-employee violates an ethical rule while opposing unlawful employment practices.

In Title VII intentional discrimination cases brought by employees who happen also to be attorneys, the panel opinion threatens the destruction of the *McDonnell Douglas* framework, which

has been carefully crafted in precedents as old as 25 years.[10] The handling of litigation based on federal statutes in an orderly and sensible manner heavily depends upon the structures, modes of proof and orders of presentation established by the Supreme Court in such cases as *McDonnell Douglas*. We ought not casually abandon these structures and precedents, even in special classes of cases, for

---

[10] *The panel opinion is directly contrary to this court's proper application of the McDonnell Douglas framework in Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130 (5th Cir. Unit A Sept. 1981), *cert. denied,* 455 U.S. 1000 (1982). The *Payne* court stated "[i]f the defendant took adverse employment action against the plaintiff because of opposition conduct by the plaintiff that was outside the protection of the statute, then the defendant **may have had** a legitimate, nondiscriminatory reason to justify its actions." *Id.* at 1142 (emphasis added). The emphasized language is important; it clearly indicates that the analysis does not end when the employer produces evidence of a legitimate nondiscriminatory reason for its employment action. The *Payne* court continued and acknowledged the necessary final step of the *McDonnell Douglas* framework that the panel in *Douglas* disregarded:

> Since the court further found that plaintiff failed to establish that defendant's proffered justification was in fact pretextual, the court concluded that '(b)ecause plaintiff exceeded the limits of reasonable opposition activity on a continuing basis and his dismissal is attributable to these transgressions, the Court is forced to conclude that his termination was not pretextual, but rather was for valid non-discriminatory reasons.'

*Id.* at 1143 (quoting *Gonzalez v. Bolger,* 486 F. Supp. 595, 601-02 (D.D.C. 1980), *aff'd,* 656 F.2d 899 (D.C. Cir. 1981) (table case)). Under this proper analysis, if the employer produces evidence that its adverse employment action was because of the employee's unreasonable conduct, **and** if the employee fails to establish that the employer's proffered reason for its adverse employment action was a pretext for unlawful discrimination, then and only then is the employer entitled to judgment that the employee has failed to prove an unlawful employment practice under § 704(a).

24

worthy but adjunctive purposes. "Considerations of stare decisis have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989). Congress has taken no action to indicate that amendments creating exceptions to the *McDonnell Douglas-Burdine-Hicks-Rhodes* framework, of the kind that will be effected by the panel opinion's rules of law, are necessary or desirable.

**B. Departure From The *Boeing* Jury Verdict Review Standard**

**1. *Rhodes v. Guiberson Oil Tools* Requires That**

**Title VII Jury Verdicts Be Tested Under**

**the *Boeing Co. v. Shipman* Standard**

In *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996)(en banc), this court held that a jury verdict in a *McDonnell Douglas-Burdine* case must be tested for sufficiency of the evidence under the standard of *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969)(en banc), *overruled in part on other grounds, Gautreaux v. Scurlock Marine, Incorporated,* 107 F.3d 331 (5th Cir. 1997) (en banc). In *Boeing*, the court adopted, as "a proper standard in federal court to test the sufficiency of the evidence for submission of a case to the jury, in connection with motions for a directed verdict and for judgment notwithstanding the verdict," id. at 367, the following standard:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence -- not just that evidence which supports the non-mover's case -- but in the light and with all reasonable inferences most favorable to the party opposed to the motion.  If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.  On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.  However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374-75 (footnote omitted).

The *Boeing* standard applies to circumstantial as well as direct evidence. *Rhodes,* 75 F.3d at 993.  Because direct evidence of discrimination is rare, a plaintiff in a discrimination case must ordinarily use circumstantial evidence to satisfy her burden of persuasion.  *Id.* (citing *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir. 1994)).  Consequently, a plaintiff need not provide direct evidence to sustain a jury finding of

26

discrimination.  *Id.* (citing, e.g., *Burns v. Texas City Refining, Inc.,* 890 F.2d 747, 751 (5th Cir. 1989)).

To sustain a finding of discrimination, circumstantial evidence must be such as to allow a rational factfinder to make a reasonable inference that discrimination was a determinative reason for the employment decision.  *Id.* at 994.  The factfinder may rely on all of the evidence in the record to draw an inference of discrimination.  *Id.*  In *Rhodes*, this court stated:

> In tandem with a prima facie case, the evidence allowing rejection of the employer's proffered reasons will often, perhaps usually, permit a finding of discrimination without additional evidence.  Thus, a jury issue will be presented and a plaintiff can avoid summary judgment and judgment as a matter of law if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [discrimination] was a determinative factor in the actions of which plaintiff complains.  The employer, of course, will be entitled to summary judgment if the evidence taken as a whole would not allow a jury to infer that the actual reason for the discharge was discriminatory.

*Id.*

## 2. Departure From *Boeing-Rhodes*Sufficiency of the Evidence Standards

The panel opinion did not test the sufficiency of the evidence for submission of this *McDonnell Douglas-Burdine-Hicks* case to the jury under the proper standards as required by our en banc

27

decisions in *Rhodes* and *Boeing*, but instead applied the panel's new mandatory rules of law to facts found *de novo* by the panel and concluded that as a matter of law that the employer was entitled to a judgment as a matter of law dismissing the employee's case.

The panel opinion turned its back on stare decisis and decided the case according to its own freestanding rules of law. The panel was duty bound in this *McDonnell Douglas-Burdine-Hicks* case by our en banc opinion in *Rhodes* to test the jury verdict for sufficiency of the evidence under our en banc *Boeing* standard, as elaborated on in *Rhodes*. The panel breached that duty by disregarding the *McDonnell Douglas* framework, refusing to determine whether the correctly instructed jury reasonably could have found for the plaintiff based on the evidence it saw and heard. The panel found the facts of the case *de novo*, and applied its own new mandatory rules of law to those facts.

The rationale of the panel decision is as follows: In a Title VII intentional discrimination case, in reviewing a defendant employer's appeal from a judgment for an attorney-employee plaintiff, based on a jury verdict in the plaintiff's favor, when the defendant argues on appeal that it terminated the plaintiff because of her unethical disclosures and not because of her opposition to the defendant's unlawful employment practices: (1) The court "must first determine [from a *de novo* review of the record] whether [the attorney-employee] breached her professional ethical duties." *Douglas,* 144 F.3d at 370; (2) Upon determining

28

that the attorney-employee violated her ethical obligations, the court must next decide "whether [the employee] demonstrated that [the employer] unlawfully retaliated against her when it terminated her employment." *Id.* at 372; (3) If the court determines (or assumes) that the plaintiff employee demonstrated that the employer terminated her because of her opposition to unlawful employment practices, the court engages in a balancing test to determine whether the opposition is entitled to protection under Title VII, in this particular case, by weighing both the employer's interest as a client in having the attorney-employee abide by state professional ethical rules <u>and</u> the state legal profession's interest in promoting ethical conduct and discouraging unethical conduct <u>against</u> the attorney-employee's individual federal statutorily protected interest under Title VII to oppose allegedly discriminatory practices by her employer. *Id.* at 375-76; (4) Upon the panel's first application of this new test in the present case, it concluded that if the individual attorney-employee's opposition to the employer's alleged unlawful practices under Title VII involves a violation of an applicable state legal professional ethical rule, the employee's federal right or statutorily protected interest can never in any such case counter the weight of the interests of the employer-client and the state legal profession; (5) Consequently, the panel transformed the balancing test into four overlapping hard-and-fast rules of law: (i) An attorney-employee's opposition to an unlawful employment practice that

29

involves a breach of a state ethical rule imposing a duty for the benefit of a client is unprotected under Title VII; (ii) The magnitude of the attorney's transgression and the risk of harm created are not relevant: "any betrayal of a client's confidences that breaches the ethical duties of the attorney places that conduct outside Title VII's protection [against retaliatory discrimination by the employer]." *Id.* at 376; (iii) If the attorney-employee's opposition conduct involves a violation of a professional ethical rule, "the employer is insulated from liability irrespective of whether it took adverse employment action because the conduct constituted a breach or because the conduct was in opposition to discriminatory employment practices." *Id.* at 377 n.16; (iv) Consequently, the employer in such a case is entitled as a matter of law to a judgment as a matter of law dismissing the employee's case. *Id.* at 376.

Under the panel opinion's new rules, the allocation of the burden of production and order for the presentation of proof established for Title VII discriminatory-treatment cases by the Supreme Court, i.e., the *McDonnell Douglas-Burdine-Hicks* framework, as well as the *Boeing-Rhodes* standards for testing jury verdicts, will be virtually obsolete in a case involving an alleged ethical violation by an attorney-employee while opposing an unlawful employment practice. The panel opinion indicates, although it does not explicitly hold, that the question of whether an attorney-employee violated her state professional code as part of her

30

opposition to an unlawful employment practice is a question of law for the court that cannot be submitted to the jury. Thus, once the court at the trial or appellate level decides that such a violation occurred as part of the attorney-employee's opposition to an unlawful employment practice, the entirety of the employee's opposition conduct becomes completely unprotected under Title VII. The panel opinion expressly holds, in diametric opposition to *McDonnell Douglas, Burdine, Hicks* and *Rhodes*, that the plaintiff in such a case cannot prevail by proving that the ethics breach was a pretext and not the true reason for the challenged adverse employment action, but that the real reason was the employer's intentional discrimination against the employee. Consequently, few Title VII intentional discrimination suits brought by attorney-employees may survive motions for summary judgment or judgment on the merits or appeals, even though the employees may be able to demonstrate that the employers' actions were motivated by unlawful discrimination rather than a legitimate, nondiscriminatory reason.

**C. Adherence To *McDonnell Douglas, Burdine, Hicks, Rhodes* and *Boeing* Requires That the Plaintiff's Jury Verdict Be Upheld**

In the present case, there definitely was sufficient evidence from which the jury reasonably could have found that DPO's proffered reasons for the discharge were false and pretextual and that Douglas's opposition to unlawful employment practices was a determinative reason for the termination of her employment. There

was a close and suspicious temporal proximity between Douglas's opposition and her discharge.  Upon receipt of Douglas's response letter complaining of EEO violations, which showed that a copy had been sent to the DOE whistle-blower officer responsible for receiving EEO complaints from DPO employees, DPO immediately convened a "termination board" and  decided to terminate Douglas's employment.  Based on the evidence introduced at trial, the jury reasonably could have found that DPO's "ethical" reason for terminating Douglas's employment was in fact a pretext because: (1) The statements in Douglas's June 24, 1994 response that DPO proffered as its reason for discharging Douglas were not in fact disclosures to DOE because DOE already had the information and it was  insignificant  anyway;  the  jury  reasonably  could  have disbelieved DPO because of this alone; or (2) if Douglas revealed any confidential information, her revelation was authorized by Rule 1.6(b), as an exception to Rule 1.6(a), because she reasonably believed the revelation to be necessary to establish a claim or defense on her behalf in a controversy with her client, DPO, or necessary to respond to allegations concerning her representation of DPO; or (3) from the record as a whole, it is evident that DPO's discharge of Douglas was motivated by Douglas's opposition to unlawful employment practices and not by any breach of a professional ethical rule she allegedly may have committed.

Under the government contract between DPO and DOE, DPO, the contractor, waived its rights of confidentiality and privilege with

32

respect to Douglas's June 24, 1994 response letter when it agreed that "[a]ll records acquired or generated by the contractor under this contract in the possession of the contractor, including [performance appraisals, reviews, and associated documents, equal employment opportunity and affirmative action claims and records, files and records concerning ethics and security investigations, and attorney-client privilege or attorney work product] shall be subject to inspection, copying, and audit by the government at all reasonable times[.]" (emphasis added).

Douglas's response to her performance appraisal was an "associated document." Poindexter testified that Douglas was terminated because the information contained in her statements in the response letter with regard to Bell South Mobility and Becky R. and Brian S. was Douglas's "attorney work product." Therefore, Douglas's June 24, 1994 response letter and her attorney work product concerning the Bell South Mobility and the Becky R. and Brian S. matters were subject to inspection, copying, and audit by the government at all reasonable times pursuant to the government contract between DOE and DPO.

Also, from the beginning of the appraisal, DPO was required to disclose to the DOE team a list of EEO-related complaints and disposition actions taken since contract inception. Becky R. had submitted a complaint against Brian S. to DPO's human resources department. Douglas had been required to confer with DOE employees

about their using DPO cellular phones for personal calls in an effort to resolve that problem with Bell South Mobility.

For all of these reasons, the jury reasonably could have concluded that Douglas's June 24, 1994 response letter did not in reality disclose any new information to DOE, or that DPO had expressly waived its rights of confidentiality and privilege with respect to this letter, and that the Becky R. and Bell South Mobility statements in Douglas's response were not the true reasons for Douglas's discharge.

As indicated by the district court's reasons for rejecting DPO's motion for judgment as a matter of law, the jury also reasonably could have found that Douglas had not made a prohibited revelation under Rule 1.6 because she reasonably believed her statements were necessary to establish a claim or defense by her in a controversy with DPO or to respond to DPO's allegations concerning her representation:

> The crux of the defendants' complaint is that the plaintiff disclosed confidential matters in her memorandum which should not have been disclosed to persons outside the company. These matters related to (1) bills from Bell South Mobility and (2) the manner in which other employees' performances were evaluated compared to hers. With respect to Bell South, the plaintiff's performance evaluation[, a recorded company document prepared by Poindexter, Douglas's supervisor,] specifically referenced her handling of that matter as a reason for a negative rating. The plaintiff's response referencing it was therefore not unreasonable. Most of her explanation dealt with generic steps she took in handling the matter, with minimal

34

disclosure of any substantive information. Likewise, her discussion of "Becky R." and "Brian S." did not disclose any substantive in-house information. It also related directly to the plaintiff's complaint that she was the victim of disparate treatment in _her_ performance evaluation. For those reasons, the Court finds there was a "legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."

(Emphasis and internal quotations in original)

Finally, even if the jury did not immediately disbelieve DPO's proffered reason for discharge because she did not actually disclose any new information to the DOE, or information to which DOE was not otherwise contractually entitled, in her June 24, 1994 response statement, the jury reasonably could have found from the evidence as a whole that DPO discharged Douglas because in her June 24, 1994 response she opposed unlawful employment practices under § 704(a) of Title VII, and not because of the information disclosed in her statements about the Becky R. complaint or the Bell South Mobility business matter. The evidence taken as a whole, including Douglas's opposition, DPO's termination of her employment, the suspicious temporal proximity between them, the fact that the statements were not truly disclosures and that no potential or actual harm resulted, DPO's contractual obligation to disclose such information during a DOE audit, the necessity for Douglas's minimal references to these matters to allege facts indicating discrimination against her by the defendants, the lack of any showing that DPO previously had genuinely considered such matters

to be strictly confidential or had discharged employees for such disclosures, and Poindexter's pre-existing animosity towards Douglas, fully support the jury's rejection of the reasons for discharge offered by the defendants and the finding that retaliatory discrimination was the determinative reason for the adverse employment decision. Moreover, because Poindexter, during his performance evaluation interview with her, told Douglas that he and Jocelyn Guarisco, DOE chief counsel, decided that Douglas had committed unspecified breaches of professional ethics during the appraisal meeting, the jury reasonably could have found that Poindexter's failure to discharge her, but rating her "Fully Satisfactory" at that time, indicated that he and DPO did not consider her breaches so serious as to warrant her discharge, and that her later opposition to unlawful employment practices in her response letter was probably what motivated DPO to discharge her.

The jury was correctly instructed that, in order to return a verdict for Douglas, it must find by a preponderance of the evidence, "that defendants' offered reasons [for discharging Douglas] are pretextual, that is, they are not the true reasons for her discharge. In other words, Ms. Douglas must prove by a preponderance of the evidence that the reasons stated by the defendants were only a cover or a cloak for retaliation." Because we must presume that the jury followed the trial court's instructions, *United States v. Brito,* 136 F.3d 397, 413 (5th Cir.), *cert. denied,* 118 S. Ct. 1817, *cert. denied,* 118 S. Ct. 2389, *cert.*

36

*denied,* 119 S. Ct. 159 (1998), we must necessarily conclude that the jury, in specifically finding that Douglas was discharged because of her protected opposition, found that DPO's offered reason for the termination of Douglas's employment was pretextual, false and only a cover for its unlawful retaliation. Moreover, the jury in making the requisite factual determination for imposing punitive damages explicitly found that "defendants acted wilfully and maliciously, or in reckless disregard of plaintiff's federally protected rights in the discharge of plaintiff in retaliation for her participation in a protected activity."

## III. THE PANEL OPINION OVERRULES *JONES V. FLAGSHIP,* *DOE V. A CORPORATION* AND MISINTERPRETS RULE 1.6

*Doe v. A Corporation.*, 709 F.2d 1043 (5th Cir. 1983); and *Jones v. Flagship International*, 793 F.2d 714 (5th Cir. 1986), *cert. denied,* 479 U.S. 1065 (1987), held that lawyers' ethics rules cannot be asserted to bar a lawyer's access to court to adjudicate her own personal rights against her client (as opposed to representing other persons against her client). The panel opinion overrules *Doe* and *Jones* by allowing an employer-client to assert an ethics rule to bar attorney-employees' enforcement of their own personal Title VII unlawful discrimination claims. The opinion creates a mandatory rule of law granting a client-employer absolute immunity from liability for retaliation prohibited by Title VII against an attorney-employee for opposing unlawful employment

37

practices, if the attorney-employee breached an ethics rule in her opposition. In addition to this new barrier to an attorney-employee's attempt to vindicate her personal claims, the panel opinion further disadvantages every Louisiana attorney having a dispute with any client by incorrectly interpreting Louisiana State Bar Association Rule of Professional Conduct 1.6 to require that the attorney must file a formal administrative or judicial complaint before there can be a "controversy" with the client that would allow the lawyer to reveal confidential information necessary to the enforcement or defense of the lawyer's own personal rights.

### A. *Doe v. A Corporation*

In *Doe*, this court held that a former in-house counsel could prosecute an action in his own behalf against his former employer with respect to claims arising under ERISA, despite his having advised the employer corporation on matters related to his lawsuit, but that he was ethically barred from prosecuting such litigation either as an attorney for or as the class representative for other employees. The court pointed out that adherence to Canon 4 requires that a lawyer be disqualified from representing a party to litigation if the adversary party can show that matters in the suit are substantially related to matters in which the attorney previously represented the adversary. *Doe,* 709 F.2d at 1046. But, the court held that lawyers' ethical rules cannot be asserted to prevent a lawyer from having access to the courts to vindicate her

38

own personal rights or tenable legal claims. *Id.* at 1047. Moreover, the court stated, a lawyer may reveal confidential information and secrets when it is necessary for her to do so to prevent the client from committing a crime, to collect a fee, or to defend herself against an accusation of wrongful conduct. *Id.* at 1048.

> The rationale for the last of these exceptions is: "It would be a manifest injustice to allow the client to take advantage of the rule of exclusion as to professional confidence to the prejudice of his attorney, or that it should be carried to the extent of depriving the attorney of the means of obtaining or defending his own rights." ABA Opinion 250 (1943).

*Id.* at 1048-49 (footnote citing authorities omitted).

In its own words, the *Doe* court concluded:

> A lawyer, however, does not forfeit his rights simply because to prove them he must utilize confidential information. Nor does the client gain the right to cheat the lawyer by imparting confidences to him. . . . There is no social interest in allowing the corporation to conceal wrongdoing, if in fact any has occurred. Nor is there any social interest in allowing it to deny Doe pension rights or insurance benefits if they are legally due him. But that would be the effect of our refusing to allow Doe to prosecute his individual lawsuit.

*Id.* at 1050.

## B. *Jones v. Flagship*

*Jones v. Flagship* also recognized an attorney's right to pursue her own personal claim against her client-employer and,

although decided prior to *Hicks* and *Rhodes*, faithfully applied the *McDonnell Douglas-Burdine* framework to ascertain that the attorney-employee had been afforded a full opportunity to rebut the employer's evidence that it had a legitimate, nondiscriminatory reason for suspending and firing her. In *Jones,* the district court entered a judgment for the employer after a bench trial. Although this court affirmed, it first ascertained that the employee had been given the opportunity to demonstrate that the employer's proffered reasons for her suspension and termination were not the true reasons for the employment decision. *Jones,* 793 F.2d at 725 n.11 (citing *McDonnell Douglas* and *Burdine*). This court recognized that Jones, although an attorney and Flagship's manager of EEO programs, had a right to be free of discriminatory practices under the protection of § 704(a); and that, in filing a charge against Flagship on the ground that the company had discriminated against her in terms of pay and sexual harassment, Jones was exercising a protected right under Title VII, as the district court found. *Id.* at 726. However, Flagship produced evidence that, in addition to filing her own Title VII claims, Jones also solicited other employees to join in a class action suit against Flagship. *Id.* at 728. This court concluded that because these additional activities involving other persons' claims were unnecessary to Jones's pursuit of her own claim and were critically harmful to Flagship in all discrimination suits against it, Flagship had met its burden of production of evidence of a legitimate, nondiscriminatory basis for

40

suspending and firing Jones. *Id.* at 729. In affirming the district court's judgment, this court held that, "although Jones did establish a prima facie case of unlawful retaliation under §704(a) of Title VII, under the *McDonnell-Burdine* allocation of burdens and order of presentation of proof, Flagship sufficiently rebutted Jones' case by adducing evidence that it suspended and fired Jones for nonretaliatory reasons[; and] that Jones did not demonstrate that the reasons proffered by Flagship were pretexts for discrimination." *Id.* at 729-30.


## C. Rule 1.6

The panel opinion, by holding that Louisiana State Bar Association Rule of Professional Conduct 1.6 provides that a lawyer-employee cannot have a controversy with, or claim or defense against, her client, which would allow the attorney to reveal confidential information to the extent necessary to enforce or defend the attorney's own personal rights, until the lawyer files a formal judicial or administrative petition against the client, incorrectly interprets the rule and further undermines every attorney's access to courts for the vindication of personal rights and claims. The panel opinion cites no authority and provides no reason for its eccentric reading of the rule. When the words of the rule are taken in their ordinary and usual sense it is evident that the drafters of the rule were aware that in reality controversies, claims and defenses usually arise before pleadings

are filed because of them, and not the other way around. For example, the Comment to Rule 1.6 of the ABA Model Rules of Professional Conduct states that an attorney's right to respond to charges of misconduct involving representation of the client arises when an assertion has been made, and that paragraph (b)(2) of Rule 1.6 does not require the attorney to await the commencement of an action or proceeding. *See* MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.6 cmt. 18 (1983). The jurisdictional tenets of both Louisiana and federal courts and administrative agencies require that a case or controversy must preexist the commencement of proceedings. The panel opinion's interpretation of the rule unnecessarily adds an additional technical snare to discourage the enforcement of an attorney's valid personal claim. In Title VII discrimination cases, the panel's misreading of the rule will have an uncalled for chilling effect upon the enforcement of an attorney-employee's federal constitutional and statutory rights. Judicial efficiency, as well as the purposes of Title VII, would be better served by a straightforward reading of Rule 1.6 to recognize that whenever a serious controversy arises between a lawyer and her client, the attorney, as well as the client, prior to filing a formal complaint, may disclose information necessary to the evaluation, protection and enforcement of legal rights, including the seeking of legal and other expert advice, the gathering of evidence, and the identification and evaluation of potential witnesses.

For all these reasons, I respectfully disagree with our court's decision not to rehear this case.[11]

ENDRECORD

---

[11] *Contrary to Judge Jolly's opinion that a majority of this court approves of his opinion, I do not believe that all of the judges who voted not to hear this case en banc did so for that reason. This court's case load approaches 8,000 appeals per year. We can only bring the entire court together to rehear a minuscule portion of the cases. Many of the judges who voted "no" probably did so because they thought we have already overfilled our en banc dockets or that there were more important cases that should be heard en banc. I, of course, respectfully disagree but recognize that that is the prerogative of each judge.*

E. GRADY JOLLY, Circuit Judge, Response To Dissent From The Denial of Rehearing En Banc:

With all due respect, the dissent is unnecessarily overwrought by the captioned opinion. Contrary to the dissent's ominous outlook, <u>Douglas v. DynMcDermott Petroleum</u>, 144 F.3d 364 (5th Cir. 1998) does not sound the death knell for the legal profession's Title VII rights. Nothing in <u>Douglas</u> precludes an attorney from properly filing suit under Title VII; nor does <u>Douglas</u> abrogate an attorney's right to seek redress for retaliatory discharge. <u>Douglas</u> merely holds that when an attorney pursues claims under Title VII, she must do so in a manner that does not violate her profession's ethical code. <u>Douglas</u>, 144 F.3d at 376. Because <u>Douglas</u> neither reaches the result the dissent alleges, nor engages in the de novo review the dissent asserts, such lamentation over its result is unwarranted.

It should be noted that <u>Douglas</u> indeed recognizes as a valid means of revealing confidential information, the exceptions under Rule 1.6 of the Louisiana State Bar Articles of Incorporation, Rules of Professional Conduct, La.Rev.Stat.Ann. § 37:219 Ch.4--App., Art. 16, which permits the disclosure, once disclosure becomes necessary in a legal dispute with the employer-client. <u>Douglas</u>, 144 F.3d at 376. <u>Douglas</u> further notes that Rule 1.6 does not bar opposition and protest in an attorney's conversations, dialogue, and remonstrations with the employer-client. <u>Id.</u>

Notwithstanding the overstated contentions running repetitively throughout the dissent, a clear majority of our court properly has concluded that <u>Douglas</u> neither transgresses the

<u>McDonnell Douglas</u> framework, nor deviates from the standards articulated in <u>Rhodes v. Guiberson Oil Tools</u>, 75 F.3d 989 (5th Cir. 1996) (en banc) or <u>Boeing Company v. Shipman</u>, 411 F.2d 365 (5th Cir. 1969) (en banc), overruled in part on other grounds, <u>Gautreaux v. Scurlock Marine, Inc.</u>, 107 F.3d 331 (5th Cir. 1997) (en banc).

For these reasons, the court has properly rejected the call for en banc in this case.